OROZCO v HENRY FORD HOSPITAL

Docket No. 62422. Decided March 31, 1980. On application by the plaintiffs for leave to appeal the Supreme Court, in lieu of granting leave to appeal, reversed the judgments of the Court of Appeals and the circuit court, and remanded the case to the circuit court for a new trial.

Rutilio and Dora Orozco brought a complaint for medical malpractice against Henry Ford Hospital and Dr. J. L. Ponka, alleging that impairment of the blood supply to one of Mr. Orozco's testicles during the course of surgical repair of a double inguinal hernia caused it to atrophy. Orozco testified that during the operation he heard one of the doctors say to another, "Oops, I cut in the wrong place", and the plaintiffs presented expert testimony that the symptoms after surgery and injury were likely caused by an impairment of the blood supply to the testicle in the course of the operation. The plaintiffs argued that the act alleged, impairment of the blood supply, was one that "even the merest tyro" would know was improper, and that their evidence concerning the doctor's admission that he cut in the wrong place was sufficient to support an inference of negligence and that the defendants should have been called upon to rebut the inference. The Wayne Circuit Court, Roman J. Gribbs, J., found Orozco's testimony insufficient evidence of negligence to avoid a directed verdict for the defendants because it did not reveal which doctor had made the admission and because it was unclear to what the statement referred, and granted a directed verdict for the defendants at the close of the plaintiff's proofs because they had failed to present expert testimony on the standard of care required in the performance of the operation. The Court of Appeals, N. J. Kaufman, P.J., and Beasley and Mahinske, JJ., affirmed in an unpublished per curiam opinion (Docket No. 77-3960). Plaintiffs apply for leave to appeal. *Held:*

1. There was evidence that one of the doctors performing the operation caught himself cutting in the wrong place. Dr. Ponka was in charge of the operation. Even assuming another doctor made the admission, it would not relieve Ponka of responsibility. He had a non-delegable duty to see that the operation was

performed with due care. The statement made admits error of the type alleged by Orozco and is enough to require the doctor to explain the statement or show that the cut was not the cause of injury.

2. The plaintiffs offered proof of the fact of the injury, a medical explanation of how that injury likely occurred, and an admission by the surgeon that he cut in the wrong place. Common knowledge and the experience of ordinary laymen do equip them, on the testimony presented, to answer whether the actions of the defendants conformed to the standards of good practice in the community.

The judgments of the Court of Appeals and of the circuit court are reversed, and the case is remanded to the circuit court for a new trial.

*Clifford R. Williams* for plaintiffs.

*Kitch & Suhrheinrich, P.C.* (by *Jeremiah J. Kenney*), for defendants.

Per Curiam. In this medical malpractice case, the trial judge granted the defendants a directed verdict at the close of the plaintiff's proofs because the plaintiff failed to present expert testimony on the standard of care required in the performance of the operation allegedly leading to his injuries. The Court of Appeals affirmed:

"Since the intricacies of the surgical procedure involved and the cause or causes of plaintiff's subsequent condition are beyond the common experience and knowledge of laymen, expert testimony was required to establish the applicable standard of care and to determine whether or not defendants breached that standard. *Lince v Monson,* 363 Mich 135; 108 NW2d 845 (1961)."

We disagree and reverse.

In 1972 Rutilio Orozco suffered a double inguinal hernia while working at a Ford Motor Company factory and entered the hospital for surgical re-

pair. Orozco had had two previous hernias, in 1953 and 1968; both were operated on successfully with no aftereffects.

Orozco entered the hospital with two testicles of normal size. The night of the operation, following the operation, the right testicle was greatly swollen; a doctor ordered that it be packed in ice. When Orozco left the hospital the testicle was the size of a grapefruit, dark and discolored. The swelling decreased and over a few weeks' time the testicle shrank to a small black nubbin, measuring 1.3 centimeters.

In his medical malpractice action against Ford Hospital and several doctors, Orozco contended that his atrophied testicle was the result of the impairment of the blood supply to the testicle which occurred during the course of the operation.

At trial Orozco offered the following testimony of a medical expert:

"The patient states categorically that his testicle was normal size prior to the herniorrhaphy. I have no way of stating positively that the testicle was of normal size, but I suspect that if one reads the history and physical examination prior to the herniorrhaphy, the statement as to scrotal contents and testicular size will be there. At the present time, it is quite apparent that the patient has a normal left testicle and scrotal content and a very small right testicle. *This is compatible with testicular atrophy that one sees sometimes following herniorrhaphy when the blood supply to the testicle which arrives at the testicle by way of the spermatic cord passing through the inguinal canal is damaged.* On the other hand, this could be compatible with an atrophic testicle secondary to something like mumps orchitis occurring previously or a congenital atrophic testicle. I think the important information as to the etiology of this small testicle relates to the occurrences in the scrotum at the time immediately following the herniorrhaphy. The other important point again, is the

matter of the record at the Henry Ford Hospital regarding testicular sizes prior to the herniorrhaphy. *A history of the great scrotal swelling followed by the decrease in the swelling and then followed again by the decrease in the size of the testicle to its present size is strongly suggestive of impairment of blood supply at the time of hernia repair.* I am only able to describe what I see and only state by conjecture what might be the etiology." (Emphasis supplied.)

Orozco himself testified:

"They freeze me only half a side and when they supposed to make me sleep. Dr. Ponka, he told another doctor, he say, 'I finished in 45 minutes.' He say, 'Well, I'm ready—I'm ready, all I need to finish this little think *[sic]* in there.' He say, 'if you work at what you do, you can do the same way I'm do—oops, I cut in wrong place.'

"*Q. [By Mr. Williams, attorney for plaintiff, continuing]:* Who said that?

"*A.* The same thing I say again. I don't know his name. This is why I'm asking for justice—'oops, I cut in the wrong place.' I am the hurt for the rest of my life."

The defendants moved for a directed verdict at the close of Orozco's case, arguing that there was no expert testimony that impairment of the blood supply to the testicles is not a usual occurrence in herniorrhaphy operations and no expert testimony as to the standard of care exercised by Dr. Ponka.

Orozco argued that it was unnecessary to offer expert testimony to prove that the defendant physician violated the standard of practice because injury to a healthy gland was clear enough for a lay jury to understand; the act alleged, impairment of the blood supply, was one "even the merest tyro would know * * * was improper", and the plaintiff's evidence concerning the doctor's admission was sufficient to support an inference of

negligence and the defendants should have been called on to rebut that inference.

In *Lince, supra,* on which the Court of Appeals relied, the plaintiff introduced evidence that the defendant doctors performed an operation in such a way as to leave a suture constricting the plaintiff's ureter. The defendants introduced testimony that they were performing an operation to free adhesions of the bowels and uterus. While performing the operation they found areas of endometriosis on the left side of the abdomen. This was described as an abnormal condition which spreads very quickly. It is customary to remove a piece of the material and check for possible malignancy. The substance is fragile and difficult to handle and bleeds profusely. The patient began hemorrhaging and the doctors found it necessary to act quickly and control the bleeding with deep sutures. The bleeding was so profuse that it obliterated the landmarks. An expert medical witness testified that under the circumstances these measures were necessary to save the patient's life.

Lince sought to invoke the "merest tyro" rule, arguing that the defendant doctors did not intend to suture the ureter and, therefore, to do so was negligent. The Court responded:

"The question here, however, is not that simple. Purpose of the operation and intent of the surgeon, alone, are not conclusive here. The question, rather, is whether the action of defendants, confronted with the endometriosis and hemorrhaging condition, obliterated landmarks and need for quick stopping of bleeding by placing stitches deep into the endometriosis mass, conformed to standards of good practice in the community. Common knowledge and the experience of ordinary laymen do not equip them to give the answer without the aid of expert medical testimony." *Id.,* p 142.

In this case no evidence was offered by the defendants indicating that they found themselves in a situation similar to *Lince.* There was evidence, however, that one of the doctors performing the operation caught himself cutting in the wrong place. The trial judge found Orozco's testimony insufficient evidence of negligence to avoid a directed verdict because it did not reveal which doctor made the admission and because it was unclear to what the statement referred.

Dr. Ponka was in charge of the operation. Even assuming another doctor made the admission, it would not relieve Ponka of responsibility. See *Barnes v Mitchell,* 341 Mich 7; 67 NW2d 208 (1954). He had a non-delegable duty to see that the operation was performed with due care. The statement made admits error of the type alleged by Orozco and is enough to require the doctor to explain the statement or show that the cut was not the cause of injury.

*Lince* was a case where the patient offered only the fact of the injury and the defendant rebutted with an account of the circumstances which led to the complication and independent expert testimony that the doctor's procedures were proper and necessary. Here Orozco offered the fact of the injury, a medical explanation of how that injury likely occurred, and an admission by the surgeon that he cut in the wrong place.

Paraphrasing *Lince,* "[t]he question is whether the action of defendants conformed to standards of good practice in the community. Common knowledge and the experience of ordinary laymen *do* * * * equip them to give the answer in a case such as this" when an expert testifies that the likely cause of injury was an impairment of the blood supply to the testicles in the course of the opera-

tion and the plaintiff testifies that the surgeon said, "Oops, I cut in the wrong place." The testimony did not justify a directed verdict.

In lieu of granting leave to appeal, pursuant to GCR 1963, 853.2(4), we reverse the judgments of the Court of Appeals and the circuit court and remand the case to the circuit court for a new trial.

Costs to the plaintiff.

COLEMAN, C.J., and KAVANAGH, WILLIAMS, LEVIN, FITZGERALD, RYAN, and BLAIR MOODY, JR., JJ., concurred.