LOCKE v PACHTMAN

Docket No. 96046. Argued March 8, 1994 (Calendar No. 5). Decided
     August 23, 1994.

Danny and Shirley M. Locke brought a medical malpractice
     action in the Washtenaw Circuit Court against Judith A.
     Pachtman, M.D., a fourth-year resident in gynecology who
     performed a hysterectomy with entocele and rectocele repair on
     Shirley Locke, and James A. Roberts, M.D., the attending
     physician. The plaintiffs alleged negligence in the use of a
     needle that broke during surgery and lodged in Shirley Locke
     and in the failure to locate and remove the needle fragment. At
     the close of proofs, the court, Henry T. Conlin, J., granted the
     defendant's motion for a directed verdict because of the plain-
     tiffs' failure to make a prima facie showing regarding the
     standard of care. Thereafter, the court, Melinda Morris, J.,
     denied the plaintiffs' motion for a new trial. The Court of
     Appeals, REILLY, P.J., and D. E. HOLBROOK, JR., J. (MARILYN J.
     KELLY, J., dissenting), affirmed in an unpublished opinion per
     curiam (Docket No. 124648). The plaintiffs appeal.

     In an opinion by Justice MALLETT, joined by Chief Justice
     CAVANAGH, and Justices BRICKLEY, BOYLE, RILEY, and GRIFFIN,
     the Supreme Court held:

     The plaintiffs failed to establish a prima facie case of medical
     malpractice against either physician.

     1. To survive a motion for a directed verdict in a medical
     malpractice action, a plaintiff must make a prima facie show-
     ing of the applicable standard of care, breach of the standard
     by the defendant, injury, and proximate causation between the
     alleged breach and the injury. In this case, the standard of care
     was not sufficiently established. The testimony of the plaintiffs'
     expert with regard to the standard of care associated with the
     needle breakage was confused, and did not relate to the plain-
     tiffs' theory of breach. Extrajudicial statements by Dr. Pacht-
     man likewise were insufficient to make a prima facie showing.
     While the statements may have indicated the doctor's belief
     that she made a mistake or acted in error, a jury could not
     reasonably infer from the statements alone that her actions did
     not conform to the standard of professional practice for the

community as a whole. The standard of care associated with needle choice and breakage is not accessible to the jury absent expert guidance. The plaintiffs provided no guidance with regard to what options were available and which of them should have been chosen. The jury should not have been left to speculate in this regard.

2. While expert testimony is the traditional and the preferred method of proving medical malpractice, exceptions to the need for expert testimony, such as the doctrine of res ipsa loquitur, are recognized. However, a bad result, of itself, is insufficient to establish that the event at issue must be of a kind that ordinarily does not occur in the absence of someone's negligence. That element either must be supported by expert testimony or must be within the common knowledge of the jury. Neither standard was met in this case.

3. The plaintiffs' claim of vicarious liability against the attending physician must fail because it presupposes negligent conduct on the part of the resident, which was not shown. In addition, the plaintiffs' negligent supervision claim is not supported by the record. No showing was made suggesting that the attending physician's action was violative of a standard of care, nor was that point inferable by the jury.

Affirmed.

Justice LEVIN, dissenting, stated that Dr. Pachtman's statements to the effect that she knew the needle that broke during surgery was too small when it was handed to her and when she used it were prima facie evidence of the standard of care and breach.

Drawing all inferences in favor of Shirley Locke, a jury reasonably could conclude that Dr. Pachtman's statements conveyed her expert medical view that it was not sound medical practice in her community to use the particular needle that she used in the surgery she was performing. The jury should decide the meaning of the statements. In deciding a motion for a directed verdict, the statements should be read favorably to the plaintiff, and thus as expressing Dr. Pachtman's expert medical view that a physician in her community would not have used such a needle for this particular surgery. The statements explain exactly what a reasonably prudent physician would have done in the same situation: used a larger needle. This is not a case in which a physician merely expressed general dissatisfaction with overall performance or merely expressed regret. Dr. Pachtman's statements satisfied the plaintiffs' burden of presenting prima facie evidence of the standard of care and breach.

*D'Avanzo & Danko* (by *Jerry P. D'Avanzo*) for
the plaintiffs.

*Plunkett & Cooney, P.C.* (by *Robert G. Kam-enec*), for the defendants.

Amicus Curiae:

*Lee R. Franklin, Monica Farris Linkner,* and
*Jeffrey T. Meyers,* for Michigan Trial Lawyers
Association.

MALLETT, J. In this medical malpractice action,
the trial judge granted defendants' motion for a
directed verdict at the close of the plaintiffs'
proofs. The Court of Appeals affirmed, finding that
plaintiff had failed to make a prima facie showing
of the standard of care related to defendants'
allegedly negligent conduct.

We affirm.

I

On August 5, 1981, plaintiff Shirley Locke
underwent a vaginal hysterectomy with entocele
and rectocele repair at the University of Michigan
Hospital.[1] The procedure was performed by defendant, Dr. Judith Pachtman, then a fourth-year
resident in gynecology. Codefendant, Dr. James
Roberts, was the attending physician and was
present for most of the surgery.[2]

---

[1] As explained at trial, an entocele is an out-pouching or hernia of
the peritoneal cavity where the bowel protrudes into the area between the vagina and the rectum. A rectocele is a hernial protrusion
of the rectum through the posterior vaginal wall.

[2] At trial, Dr. Roberts explained that he was the senior medical
officer involved in the procedure. However, he also stated that, as
attending physician, his role was to act as assistant and consultant to
Dr. Pachtman, who actually performed the surgery.

Dr. Pachtman essentially agreed with Dr. Roberts' characterization

Dr. Pachtman testified that she performed the first two procedures, the hysterectomy and entocele repair, without complication, although the entocele repair took longer than expected. Following the entocele repair, Dr. Roberts left the room to attend another operation that had been previously scheduled.

Dr. Pachtman then began the rectocele repair. Upon Dr. Pachtman's initial insertion into the levator ani muscle, the needle she was using broke. One-half to two-thirds of the needle, a length of about 1.5 cm, broke off and lodged somewhere within that muscle. Dr. Pachtman searched unsuccessfully for the broken portion of the needle for fifteen to twenty minutes. At that time, Dr. Roberts returned and joined Dr. Pachtman in searching for the needle fragment.

Drs. Pachtman and Roberts utilized a silver probe to x-ray the affected area, in an attempt to locate the broken portion of the needle. After ascertaining the approximate location of the fragment, they decided to close the old incision and to continue their search through a new incision.[3] After unsuccessfully searching for the needle for another forty-five minutes to one hour, they abandoned the search and closed the second incision. Both doctors indicated that they felt it was in the plaintiff's best interest to terminate the surgery at that point, even though they had failed to locate the needle fragment.

Plaintiff testified that after the surgery Dr. Pachtman informed her of the needle breakage and stated that the needle was entrenched in the

of his role in the procedure, but asserted nevertheless that, as attending physician, Dr. Roberts had "ultimate responsibility" for the surgery.

[3] Dr. Pachtman cited plaintiff's substantial blood loss in and around the original incision as the reason for that decision.

muscle and therefore could remain there without causing her any problems. However, after experiencing considerable pain and discomfort, plaintiff consulted with another physician, Dr. Frances Couch. Dr. Couch advised removing the needle fragment, and, subsequently, she performed the surgical procedure, successfully locating and removing the broken portion of the needle.

Plaintiff filed suit against Drs. Pachtman and Roberts, alleging negligence on various grounds, including the use of a needle that they knew or should have known was too small and failing to locate and remove the needle fragment. Plaintiff claimed that she suffers from severe pain, disfigurement, and limitation of body movement and functions, as well as experiencing mental and emotional distress. Plaintiff's husband, Danny Locke, filed a derivative claim.

In testimony presented at trial, plaintiffs' expert witness, Dr. Couch, was unable to identify any negligent conduct on the part of either Dr. Pachtman or Dr. Roberts.[4] Dr. Couch also stated that she could not give an opinion regarding the adequacy of the needle size, because she had never viewed the needle intact. She explained that she could not identify the size of the needle without viewing the needle in its entirety.

When questioned generally regarding the cause of needle breakage and its relation to the standard of care, Dr. Couch made two separate statements. At one point Dr. Couch stated that the standard of care did not relate to needle breakage at all, but rather to how one dealt with it, suggesting that needle breakage was simply one of the risks of surgery. Later, without relating this point to a standard of care, she noted that a surgeon's "incor-

----

[4] Dr. Couch did not appear at trial, but a redacted version of her deposition was read into the record.

rect technique" often causes a needle to break. When asked to describe what she meant by incorrect technique, Dr. Couch described instances in which a surgeon fails to manipulate the needle correctly, such as by inserting it at the wrong angle or applying too much force. Dr. Couch also testified that she had previously had a needle break while performing surgery.

In addition to Dr. Couch's expert testimony, plaintiffs introduced evidence regarding a number of statements allegedly made by Dr. Pachtman following the surgery.

Plaintiff's brother, Reverend Gary Heniser, testified that, while he was at the hospital visiting his sister, Dr. Pachtman told him, " 'I knew the needle was too small when I used it.' "

Coplaintiff Danny Locke testified that Dr. Pachtman had also spoken to him about the surgery: "[S]he told me that it was her fault, that she used the wrong needle, and she was sorry."

Finally, Shirley Locke testified that Dr. Pachtman had told her:

> "I knew that needle was too small when the new scrub nurse handed it to me. It wasn't her fault because she was new, but I chose to use it anyway and it's my fault and I am really sorry . . . ."[5]

Both Dr. Pachtman and Dr. Roberts testified at trial. Neither acknowledged any negligent behavior in the choice of needle, the needle breakage, or their subsequent search for the needle fragment.

At the close of plaintiffs' proofs, the trial court granted defendants' motion for directed verdict on

[5] Although originally stating that these were Dr. Pachtman's exact words, plaintiff later retracted that characterization, asserting, instead, that the above quotation represented the substance of what Dr. Pachtman had conveyed to her.

the ground that plaintiffs had failed to make a prima facie showing regarding the standard of care. Plaintiffs' motion for a new trial was denied, and, in a divided opinion, the Court of Appeals affirmed. This Court granted leave to appeal. 444 Mich 893 (1993).

## II

Proof of a medical malpractice claim requires the demonstration of the following four factors: (1) the applicable standard of care, (2) breach of that standard of care by the defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury. MCL 600.2912a; MSA 27A.2912(1).[6] To survive a motion for directed verdict, the plaintiff must make a prima facie showing regarding each of the above elements.

Plaintiffs argue that the lower courts erred in finding that they had failed to demonstrate the standard of care applicable to defendants' conduct. Plaintiffs contend that expert testimony was sufficient to establish this point, and, further, that the standard of care and breach of that standard were

---

[6] MCL 600.2912a; MSA 27A.2912(1) provides:

In an action alleging malpractice the plaintiff shall have the burden of proving that in light of the state of the art existing at the time of the alleged malpractice:

(a) The defendant, if a general practitioner, failed to provide the plaintiff the recognized standard of acceptable professional practice in the community in which the defendant practices or in a similar community, and that as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.

(b) The defendant, if a specialist, failed to provide the recognized standard of care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, and as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.

inferable under the doctrine of res ipsa loquitur and because the alleged negligence was within the common understanding of the jury.

We agree with the lower courts' determination that no prima facie showing was made, and therefore we affirm the directed verdict entered for the defendants.

### III

When evaluating a motion for directed verdict, the court must consider the evidence in the light most favorable to the nonmoving party, making all reasonable inferences in the nonmoving party's favor. *Beals v Walker,* 416 Mich 469, 480; 331 NW2d 700 (1982).

Because different theories of recovery are involved, we will address the claims against each defendant individually.

### A

Plaintiffs argue first that the standard of care attributable to Dr. Pachtman was established by way of expert testimony. This Court has long recognized the importance of expert testimony in establishing a medical malpractice claim, and the need to educate the jury and the court regarding matters not within their common purview. As we have previously explained:

> In a case involving professional service the ordinary layman is not equipped by common knowledge and experience to judge of the skill and competence of that service and determine whether it squares with the standard of such professional practice in the community. For that, the aid of expert testimony from those learned in the profession involved is required. [*Lince v Monson,* 363 Mich 135, 140; 108 NW2d 845 (1961).]

While we have recognized exceptions to this requirement, the benefit of expert testimony, particularly in demonstrating the applicable standard of care, cannot be overstated.

In this case, plaintiffs contend that the standard of care applicable to Dr. Pachtman was established by Dr. Couch's expert testimony. For this point, plaintiffs rely on Dr. Couch's statement that needle breakage often occurs because of the surgeon's "incorrect technique." Plaintiffs assert that this testimony, coupled with Dr. Pachtman's admissions regarding use of a needle she knew to be too small, were sufficient to establish the standard of care and breach of that standard.

Dr. Couch's testimony with regard to the standard of care associated with needle breakage was rather confused. At one point she suggested that needle breakage was merely one of the risks of surgery, and that needle breakage did not ordinarily signal a violation of the standard of care:

> *Q.* Do you feel that when a needle breaks off during a hysterectomy procedure as in this case that it is not a standard of care question but rather is just one of the contemplated risks of such surgery?
>
> *A.* Yes, that is correct. It's not a standard of care. You always know that there will be something, maybe some equipment failure but standard of care is how you deal with the situation.

Dr. Couch later testified that needle breakage may be attributable to a surgeon's "incorrect technique":

> *Q.* From your experience and your training can the manner in which a surgeon utilizes a needle cause it to break?
>
> *A.* I would say most of the time that's the case. It's a matter of incorrect technique.

*Q.* Could you discuss that?

*A.* Well, a needle is curved. If you forget the needle is curved and you push against the curve instead of with the curve the needle will break. If you try to put a needle through an instrument it doesn't go through steel. If it's not positioned correctly in a tissue and you're trying to draw it through against a clamp it will break. It will break . . .

\* \* \*

*A.* Generally that's most of the reason why they break. You are putting force against where it wasn't made to be put against.

As the lower courts found, it is indeed questionable whether Dr. Couch's latter testimony on this point was sufficient to establish a standard of care with regard to "incorrect technique." Dr. Couch, while presenting one way in which needles break, never went so far as to relate that discussion to a standard of care. In effect, she never explained what a reasonably prudent surgeon would do, in keeping with the standards of professional practice, that might not have been done by Dr. Pachtman. Accordingly, the jury would have had no standard against which to measure Dr. Pachtman's conduct. This factor, coupled with the conflicting nature of Dr. Couch's testimony, leads us to believe that the standard of care was not sufficiently established.

We further note that Dr. Couch's explanation of how and why needles break, even had it established a standard of care, provides little support for the specific theory of negligence advanced by plaintiffs in the complaint and at trial. While plaintiffs argued that the needle broke in this case because it was of an inadequate size for the area to be sutured, Dr. Couch's description of "incorrect technique" leading to needle breakage related to

the way the chosen needle is positioned and manipulated, regardless of its size. Dr. Couch did acknowledge at one point that there is such a thing as using a needle that is too small or too weak for a particular task.[7] However, she never related this to her theory of "incorrect technique," nor did she indicate that the needle utilized by defendants was of an inappropriate size. We find her statement, either standing alone or in conjunction with her testimony regarding incorrect technique, to be insufficient to establish a standard of care. Therefore, no prima facie showing was made.[8]

---

[7] Dr. Couch testified regarding this point as follows:

*Q.* Is there such a thing as a surgeon using a needle that's too small for the particular job at hand?
*A.* Sure.
*Q.* And when I say too small I mean utilizing a needle that may not be strong enough or big enough for the particular job at hand?
*A.* Correct.

[8] Plaintiffs also contend that the trial court erred in taking into account *defendants'* evidence in determining that expert testimony was not sufficient to establish a prima facie case. Specifically, plaintiffs argue that the trial court improperly considered the testimony of defendants' expert, Dr. Floyd, who testified that no malpractice had been committed. Dr. Floyd's testimony was heard out of order because he could not be present at a later date.

In passing upon a motion for directed verdict, a trial judge must consider the evidence in plaintiff's favor *unqualified* by any conflicting evidence. The trial judge is not prohibited from considering evidence presented by a defense witness per se; rather, the judge may not consider evidence from *any* witness to the extent that it conflicts with evidence in plaintiff's favor. Here, however, it is clear that Dr. Floyd's testimony did not conflict with any in plaintiffs' favor. In making his findings, the trial judge explicitly stated that there was *no testimony* that "points toward a breach of the standard of care expected of surgeons in cases such as this." Further, the trial judge also specifically found that defendants' expert had failed to identify any breach of the standard of conduct, noting, "Dr. Couch testified and did not make any statement on the testimony that I was able to review in which she indicated that there was any malpractice in this case." Accordingly, there was no error.

B

Plaintiffs next argue that the statements alleg-
edly made by Dr. Pachtman were themselves suffi-
cient to establish the standard of care and breach
of that standard. Plaintiffs contend that their case
is governed by this Court's decision in *Orozco v
Henry Ford Hosp,* 408 Mich 248; 290 NW2d 363
(1980), and that, under the reasoning presented in
*Orozco,* the lower courts erred in finding that
defendant's admissions alone were insufficient to
establish the standard of care.

Plaintiffs' reliance upon *Orozco* is misplaced. In
*Orozco,* the plaintiff testified that during his her-
nial surgery he heard one of the surgeons say,
"Oops, I cut in the wrong place." *Id.* at 254.
Following the surgery, one of his testicles atro-
phied. At trial, an expert witness testified that this
injury was likely due to an impairment of the
blood supply to the testicles during the surgery.

At the close of Orozco's proofs, the trial court
granted the defendants' motion for a directed ver-
dict, and the Court of Appeals affirmed, finding
that the plaintiff had failed to make a prima facie
showing of the applicable standard of care.[9] This
Court reversed the Court of Appeals by per curiam
opinion. The Court found that expert testimony
was not necessary because jury members would be
able to determine, from their own common knowl-
edge, whether the defendants' actions violated the
applicable standard of care. As the Court ex-
plained:

Here Orozco offered the fact of the injury, a

[9] In reaching this conclusion, the Court of Appeals relied on *Lince v
Monson, supra.* In *Lince,* this Court held that expert testimony was
required in order for the jury to determine whether the defendants
violated the standard of care when they mistakenly sutured the
plaintiff's ureter in responding to excessive bleeding. 363 Mich 142.

medical explanation of how that injury likely oc-
curred, and an admission by the surgeon that he
cut in the wrong place.

Paraphrasing *Lince,* "[t]he question is whether
the action of defendants conformed to standards of
good practice in the community. Common knowl-
edge and the experience of ordinary laymen
*do* . . . equip them to give the answer in a case
such as this" when an expert testifies that the
likely cause of injury was an impairment of the
blood supply to the testicles in the course of the
operation and the plaintiff testifies that the sur-
geon said, "Oops, I cut in the wrong place." [408
Mich 253-254. Emphasis in original.]

As is indicated above, the Court in *Orozco* did
not rely exclusively upon the defendant's *admis-
sion* to find that a prima facie showing had been
made. Rather, the Court found that on the basis of
that admission and corroborating expert testimony
the jury could determine *from their own common
knowledge* whether the defendants' actions con-
formed to standards of professional practice. This
decision was in line with previous case law holding
that expert testimony is not normally required
where the defendant mistakenly treated or did
injury to a portion of the body that was free of
disease and not designated for treatment. *Sullivan
v Russell,* 417 Mich 398, 408; 338 NW2d 181 (1983)
(no expert testimony was necessary where a den-
tist mistakenly ground three of the plaintiff's
teeth not intended for treatment); *Higdon v Carle-
bach,* 348 Mich 363, 374; 83 NW2d 296 (1957)
(expert testimony was not required where a den-
tist, using a rotating disk to separate two of the
plaintiff's teeth, mistakenly cut into her tongue).

Turning to the present case, we hold that the
lower courts correctly concluded that Dr. Pacht-
man's statements were insufficient to make a
prima facie showing. While the statements may

have indicated Dr. Pachtman's belief that she made a mistake or acted in error,[10] a jury could not reasonably infer from those statements alone that Dr. Pachtman's actions did not conform to the standard of professional practice for the community as a whole.

Unlike the situation presented in *Orozco*, the standard of care associated with needle choice and needle breakage is not accessible to the jury absent expert guidance. Plaintiffs have provided no guidance with regard to what options were available to Dr. Pachtman and which of them she should have chosen. In short, there was no testimony regarding what a reasonably prudent surgeon would have done in Dr. Pachtman's situation. We agree with the Court of Appeals determination that the jury should not be left to speculate in this regard. It is precisely to avoid such speculation that expert testimony is ordinarily required.

Accordingly, without diminishing the holding in *Orozco*, we decline to extend it to the present case, in which the standard of care associated with the alleged negligence is not within the common knowledge of the jury, it cannot be reasonably inferred from the admissions alone, and where no further evidence was presented linking Dr. Pachtman's admissions to the standard of care. While it is conceivable that in some circumstances a doctor defendant's extrajudicial admissions could present prima facie evidence of breach of the standard of care, that is not the case here.

C

Plaintiffs next argue that even if expert testimony was insufficient, the case against Dr. Pacht-

[10] We do not adopt the Court of Appeals characterization of these statements as an "expression of her regret . . . ." Unpublished opinion per curiam, issued February 17, 1993 (Docket No. 124648).

man should have proceeded to the jury on the theory of res ipsa loquitur. Specifically, plaintiffs contend, under this doctrine, a prima facie case was made, with regard to both the needle breakage and the fact that defendant terminated the surgery without having recovered the needle. The lower courts rejected these arguments, as do we.

As previously noted, while expert testimony is the traditional and the preferred method of proving medical malpractice, exceptions to the need for expert testimony have been recognized. One such exception involves the doctrine of res ipsa loquitur. If a plaintiff's case satisfies the dictates of this doctrine, then the case may proceed to the jury without expert testimony.

This Court's decision in *Jones v Porretta,* 428 Mich 132; 405 NW2d 863 (1987), marked the Court's first explicit adoption and application of res ipsa loquitur in the medical malpractice context.[11] In *Jones,* the Court cited the following four factors as necessary to a res ipsa loquitur claim:

(1) the event must be of a kind which ordinarily does not occur in the absence of someone's negligence;

(2) it must be caused by an agency or instrumentality within the exclusive control of the defendant;

(3) it must not have been due to any voluntary action or contribution on the part of the plaintiff. . . .

[4] "[e]vidence of the true explanation of the event must be more readily accessible to the defendant than to the plaintiff." [*Id.* at 150-151.]

In the medical malpractice context, the crucial

[11] However, as noted by the Court, the essential equivalent of the doctrine had long been recognized in this state under the guise of " 'circumstantial evidence of negligence . . . .' " *Id.* at 150.

element, and that most difficult to establish, will often be the first factor, i.e., that the event is of a kind that does not ordinarily occur in the absence of negligence. A bad result will not *itself* be sufficient to satisfy that condition. As the Court explained:

> This does not mean that a bad result cannot be presented by plaintiffs as part of their evidence of negligence, but, rather, that, standing alone, it is not adequate to create an issue for the jury. *Something more is required, be it the common knowledge that the injury does not ordinarily occur without negligence or expert testimony to that effect.* [*Id.* at 154. Emphasis added.]

Therefore, the fact that the injury complained of does not ordinarily occur in the absence of negligence must either be supported by expert testimony or must be within the common understanding of the jury. Neither standard was met here.

Plaintiffs first argue that expert testimony was sufficient for the jury to find that needle breakage does not ordinarily occur without negligence. We disagree. Even plaintiffs' own expert acknowledged at one point that needle breakage is one of the risks of surgery, suggesting that faulty equipment might be a cause of breakage. Therefore no prima facie showing was made.

In the alternative, plaintiffs contend that no expert testimony is required because it is within the common understanding of the jury that needles do not ordinarily break absent negligence. For this theory, plaintiffs rely on this Court's holding in *LeFaive v Asselin,* 262 Mich 443; 247 NW 911 (1933). In *LeFaive,* the Court held that a jury could determine, without the aid of expert testimony, that the defendant's action in inadvertently

leaving a needle within the plaintiff's incision violated the applicable standard of care.

Plaintiffs' analogy to *LeFaive* is inapposite. In *LeFaive,* the act of leaving the needle within the incision was one of carelessness, from which negligence may easily be discerned. However, a far different situation is presented where a needle breaks off, and the surgeon, despite attempts to locate the fragment is *unable* to. One could not reasonably conclude, on the basis of common knowledge, that such an event does not ordinarily occur in the absence of negligence. Where negligence is not inferable through common knowledge, and where no expert testimony was presented to the effect that the event complained of would not ordinarily occur without negligence, plaintiffs' res ipsa loquitur claim must fail.[12]

D

Lastly, plaintiffs contend that a prima facie case was made against Dr. Pachtman because the negligence alleged was so gross as to be within the common understanding of the jury.

This Court has previously held that expert testimony may not be required when

> "the lack of professional care is so manifest that it would be within the common knowledge and experience of the ordinary layman that the conduct was careless and not conformable to the standards of professional practice and care employed in the community." [*Sullivan,* 417 ·Mich 407, quoting *Lince,* 363 Mich 141.]   ·

---

[12] Plaintiffs argue that the trial court impermissibly relied on a Missouri case, *Cebula v Benoit,* 652 SW2d 304 (Mo App, 1983), in determining that res ipsa loquitur does not apply in instances in which a needle breaks off during surgery and cannot be located by the surgeon. We can discern no impropriety in the court's reference to this decision for guidance.

However, as was discussed in parts B and C, we do not find the standard of care with relation to Dr. Pachtman's allegedly negligent use of an inadequately sized needle to be within the common understanding of the jury. Nor do we find the standard of care applicable to defendants' decision to terminate the surgery, without having recovered the needle, to be ascertainable by the jury without the aid of expert testimony.

### E

Plaintiffs assert liability against Dr. Roberts on two grounds: (1) vicarious liability for the negligent acts of Dr. Pachtman, and (2) negligent supervision. However, plaintiffs failed to establish a prima facie case under either standard.

Plaintiffs' vicarious liability claim fails because it presupposes negligent conduct on Dr. Pachtman's behalf. As previously discussed, plaintiffs have failed to establish a prima facie case of liability against Dr. Pachtman.

Plaintiffs' negligent supervision claim is also not supported by the record. There was uncontroverted testimony, including testimony from plaintiffs' own expert, to the fact that it was not unusual for an attending physician at University of Michigan Hospital to leave a resident alone during portions of a procedure. There was no testimony suggesting that such action was violative of a standard of care, nor do we find that point inferable by the jury. Therefore this claim is also without merit.

### IV

We agree with the lower courts' determination that plaintiffs failed to establish a prima facie case

of medical malpractice against either Dr. Pacht-man or Dr. Roberts.

We affirm.

CAVANAGH, C.J., and BRICKLEY, BOYLE, RILEY, and GRIFFIN, JJ., concurred with MALLETT, J.

LEVIN, J. (*dissenting*). I agree with the majority that expert medical testimony concerning the standard of care and a breach was required. I also agree that the plaintiffs did not establish a jury submissible question of fact on the basis of res ipsa loquitur or on the basis that the evidence of negligence was within the common understanding of the jury.

I would hold, however, that Dr. Judith A. Pacht-man's statements to the effect that she knew the needle that broke during surgery was too small when it was handed to her, and when she used it, were prima facie evidence of the standard of care and breach.

I

The question presented is whether Pachtman's statements—in effect admitting error but not in lawyer jargon such as "standard medical practice in this community"—are prima facie evidence of the standard of care and breach.

Plaintiff, Shirley Locke testified that Pachtman said that she knew the needle was too small when the new scrub nurse handed it to her, and Danny Locke testified that Pachtman said that she knew the needle was too small when she used it. Drawing all reasonable inferences in favor of Shirley Locke, a jury could reasonably conclude that Pachtman's statements conveyed her expert medical view that it was not sound medical practice in

her community to use the particular needle she used in the surgery she was performing.

The majority concludes that Pachtman's statements may have expressed her belief that she violated her personal standard of care, and her personal standard of care may have been higher than the prevailing standard of care among physicians in the community.

Pachtman's statements may indeed have concerned her personal standard of care. It is no more probable, however, that the statements concerned her personal standard of care than that they concerned the generally applicable standard of care. The statements refer neither to a personal nor a general standard of care. The statements can reasonably be read either way, and a jury should decide the meaning of Pachtman's statements.[1] In deciding a motion for a directed verdict, Pachtman's statements should be read favorably to the plaintiffs, and thus as expressing Pachtman's expert medical view that a physician in her community would not have used a needle of the size that she used for this particular surgery.

The majority next contends that Pachtman's statements are not sufficient to establish the standard of care because the statements did not explain "what a reasonably prudent surgeon would

[1] In *Wooten v Curry*, 50 Tenn App 549, 552, 554; 362 SW2d 820 (1961), as distinguished from the instant case, the physician, under the law of Tennessee, was subject to liability for malpractice if his conduct fell below his personal standard of care. The plaintiff sought to establish the physician's personal standard of care by introducing the physician's statement that he "should" have examined the plaintiff sooner than he did.

The Tennessee Court of Appeals held that the statement was prima facie evidence of the physician's personal standard of care, and held that a jury must construe any ambiguity in the statement. In the court's words, "[t]he meaning of, and the weight to be given an admission or declaration against interest are generally questions for the jury."

have done in Dr. Pachtman's situation."[2] But Pachtman's statements explain exactly what a reasonably prudent physician would have done in the same situation: a reasonably prudent physician would have used a larger needle. This is not a case in which a physician merely expressed general dissatisfaction with her overall performance or merely expressed regret.

## II

Cases from other jurisdictions indicate that statements like Pachtman's—that confess error with reasonable specificity—are prima facie evidence of the standard of care and breach.

In *Greenwood v Harris,* 362 P2d 85, 87-88 (Okla, 1961), the plaintiff alleged that the physician erroneously diagnosed her pregnancy as a tumor, and then performed unnecessary surgery that left the plaintiff with an unsightly and painful scar. The plaintiff's only evidence concerning the standard of care was the physician's statements to the plaintiff and her husband that he " 'should have made more tests,' " and that he " 'wasn't satisfied with the lab report [and] *should have had the tests run again, . . .* should have made some other tests.' " (Emphasis added.) The Oklahoma Supreme Court held that those statements alone were prima facie evidence of the standard of care and breach. The court said:

> We can interpret these statements in no other way than as an admission that a faulty diagnosis had been made due to the failure of the defendant to use and apply the customary and usual degree of skill exercised by physicians in the community.

In *Woronka v Sewall,* 320 Mass 362, 364; 69

[2] *Ante,* p 229.

NE2d 581 (1946), the plaintiff claimed that her physician negligently exposed the skin on her buttocks to irritating chemicals during the delivery of a child. The plaintiff's only evidence of the standard of care and breach was the physician's statements to the plaintiff and her husband that the plaintiff's burns resulted from "negligence when they [the plaintiff and the physician] were upstairs [in the delivery room]," and that the plaintiff's injury apparently occurred when a chemical solution was allowed to stay in contact with her skin for "too long a period." The physician argued that the word "negligence" did not supply the essential elements justifying a finding of liability.

The Supreme Judicial Court of Massachusetts held, however, that the plaintiff had produced sufficient evidence of the essential elements. The court reached this conclusion although the only testimony that explicitly mentioned the applicable standard of care came from a defense expert who opined that the use of the chemical that irritated the plaintiff was accepted medical practice in Boston at the time of plaintiff's injury.[3]

In *Greenwood* and *Woronka,* the physicians' statements indicated with relative precision how they had erred. In *Greenwood,* the physician, in effect, confessed error in failing to administer certain tests for a second time in the face of inconclusive results, and, in *Woronka,* the physi-

---

[3] In *Sheffield v Runner,* 163 Cal App 2d 48; 328 P2d 828 (1958), a physician's statement that he should have put the patient in a hospital was held to be prima facie evidence of the standard of care and breach. In *Wickoff v James,* 159 Cal App 2d 664; 324 P2d 661 (1958), a physician's statement that he "sure messed up" was held to be prima facie evidence of the standard of care and breach. In *Robertson v LaCroix,* 534 P2d 17, 19 (Okla App, 1975), a physician's statement that he "just made a mistake and got over too far" during surgery was held to be prima facie evidence of the standard of care and breach.

cian stated that he improperly permitted the plaintiff's buttocks to stay in contact with a chemical irritant.

Other state supreme courts have found that the standard of care was not established by statements that fail to explain with relative precision what the physician should have done. In *Senesac v Associates in Obstetrics & Gynecology,* 141 Vt 310, 314-315; 449 A2d 900 (1982), the plaintiff claimed that the physician had negligently performed an abortion. The plaintiff's only evidence of the standard of care was the physician's statement that she "had made a mistake, that she was sorry, and that it [the perforation of the uterus] had never happened before . . . ." The Vermont Supreme Court held that the statement was not prima facie evidence of the standard of care.

In *Maxwell v Women's Clinic,* 102 Idaho 53, 54; 625 P2d 407 (1981), the plaintiff claimed that the defendant physician negligently performed a tubal ligation. The plaintiff's only evidence regarding the standard of care was the physician's statement that he "obviously messed up." The Idaho Supreme Court held that summary judgment against the plaintiff was properly granted because the plaintiff did not present sufficient evidence of breach of the standard of care.[4]

In both *Maxwell* and *Senesac,* the physicians' statements did not explain relatively precisely—as did Pachtman's—how they had erred.

III

I conclude, consistent with precedent from other

[4] In *Cobbs v Grant,* 8 Cal App 3d 229, 238; 104 Cal Rptr 505; 502 P2d 1 (1972), the physician's statement that he "blamed himself for [the plaintiff] being back in there [the hospital]" was held not to be prima facie evidence of the standard of care and breach.

jurisdictions, that Pachtman's statement satisfied Lockes' burden of presenting prima facie evidence of the standard of care and breach.

I would reverse the judgment of the Court of Appeals and remand for trial.