*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CHARLES ABDULKARIM and SOUAD GHRABY,

UNPUBLISHED
October 24, 2019

Plaintiffs-Appellees,

v

No. 341950
Oakland Circuit Court
LC No. 2016-151835-NH

RONALD S. LEDERMAN, M.D., PLLC, doing business as LEDERMAN KWARTOWITZ CENTER FOR ORTHOPEDICS, RONALD S. LEDERMAN, M.D., and MARK KWARTOWITZ, D.O.,

Defendants-Appellants,

and

ROYAL OAK SURGICAL CENTER, LLC,

Defendant.

Before: MARKEY, P.J., and FORT HOOD and GADOLA, JJ.

PER CURIAM.

Healthcare defendants, with the exception of Royal Oak Surgical Center, LLC, appeal by leave granted the trial court's order denying their motion for partial summary disposition in this medical malpractice action brought by plaintiffs. We affirm.

Plaintiff Charles Abdulkarim[1] underwent arthroscopic surgery on his right shoulder on August 1, 2014. Defendants Dr. Lederman was lead surgeon, and Dr. Kwartowitz, also a

---

[1] Plaintiff Souad Ghraby's claims are solely derivative of Mr. Abdulkarim's claims. We use the term "plaintiff" in the singular when referring specifically to Mr. Abdulkarim.

surgeon, was first assistant. The procedure entailed the use of electrocautery, which is the process of heating tissues with electricity to seal blood vessels and stop bleeding. Electrocautery requires that an adhesive electrosurgical grounding pad be secured smoothly to and flush with a cleared area of a patient's skin; there must be firm contact between the pad and the skin so as to prevent arcing of the electrical current and burns to the patient. When the grounding pad was removed from plaintiff's left lateral flank following the surgery, it was discovered that he had suffered a burn at the site of the pad. A nursing note indicated that the pad was "puckered" and "not intact on the skin" after the surgery. Drs. Lederman and Kwartowitz testified in their depositions that they did not place the grounding pad on plaintiff as that was the responsibility of operating room nurses or other surgical staff. There were two registered nurses present in the operating room when plaintiff's surgery was performed. One of the registered nurses testified that she did not know who had placed the grounding pad on plaintiff. The other nurse testified that she did not apply the grounding pad to plaintiff's skin and that it was placed on him by an unnamed physician's assistant.

Plaintiffs' expert, Dr. Robert C. Corn, opined that the standard of care required Drs. Lederman and Kwartowitz to ensure that the grounding pad had been appropriately secured to plaintiff so as to avoid the potential for a burn injury.[2] Dr. Corn reaffirmed in his deposition all of the averments that he had made in his affidavit of merit, which included the assertion that the surgeons breached the standard of care by failing to secure the grounding pad "*prior to* and during the surgical procedure." (Emphasis added.) Dr. Corn testified that the grounding pad was not properly applied to plaintiff's skin, ultimately resulting in the burn. Dr. Corn testified that "[w]ithin a reasonable degree of certainty, . . . the breach occurred prior to the beginning of the surgical procedure." Dr. Corn noted that if the grounding pad had been flush with the skin at the start of the surgery, plaintiff would not have suffered a burn, which occurred sometime during the surgery.[3] Additionally, Dr. Corn was asked, "Would it be reasonable and within the standard of care for a surgeon to check the pad before the surgery and then check the pad at the end of the surgery?" Dr. Corn responded, "I don't really think that would be necessarily [the] standard of care." We emphasize that Dr. Corn's answer was in reply to the question whether a surgeon should check the pad before *and* after the surgical procedure.[4] We also note that Dr. Corn

---

[2] Dr. Corn's deposition testimony was as follows:

> *Q.* Am I correct in stating that the breaches in the standard of care that you have identified [in your affidavit] continue to be that Dr. Kwartowitz and Dr. Lederman were required to ensure the electrosurgical grounding pad was appropriately secured to [plaintiff] . . . ?
>
> *A.* Correct.

[3] Dr. Corn testified that he does not always check the grounding pad before starting a procedure, although he should. Dr. Corn stated, "I would say probably 80 percent of the time I do."

[4] The dissent fails to appreciate this crucial aspect of Dr. Corn's deposition testimony.

immediately launched into a nonresponsive narrative of who *places*, not checks, a grounding pad on a patient.

Dr. Corn indicated that the standard of care does not require a surgeon to actually place the grounding pad on a patient, which job is ordinarily performed by a nurse, a physician's assistant, a trained technician, a surgical assistant, or other hospital personnel. He testified that it is appropriate for a surgeon to delegate placement of a grounding pad to surgical staff. Dr. Corn further explained:

> [W]e delegate authority and responsibilities to people who we trust, and that's the reason why I don't put on the [grounding] pad. There are people that are there and take responsibility for that, but obviously as the surgeon I am ultimately responsible for their behavior and their accuracy and how well they do their job . . . .

Dr. Corn testified that it is "pretty hard" to see the grounding pad during surgery because the surgical area is draped. With respect to the possibility that movement by plaintiff during the surgery caused the puckering of the grounding pad, Dr. Corn asserted:

> [The pad] couldn't have gotten loose with the surgery. The patient was already positioned in the beach chair position so they're literally tied down in that position. There is no indication that anything else occurred that would loosen up that contact, so I assume that there's nothing to loosen it up and nobody noted anything differently and no alarm went off[.] . . . [The pad] obviously wasn't applied as well as it was thought to be applied or as completely as it was thought to be applied.

Dr. Corn reiterated that "[m]ore likely than not [the pad] was not applied appropriately and there were gaps that were not recognized until after the surgery was done."

Dr. William Kohen, an expert witness for the defense, agreed with Dr. Corn that the standard of care does not obligate a surgeon to place or secure the grounding pad on a patient. Dr. Kohen acknowledged that if a surgeon actually observes an incorrectly placed grounding pad, the standard of care requires the surgeon to stop the surgical procedure and take steps to rectify the problem. With respect to the "puckered" grounding pad, which Dr. Kohen believed likely caused the burn, he opined that it could be attributed to improper placement of the pad, to movement of plaintiff during the surgery, or to some other mechanism. Dr. Kohen opined that it is simply not the role of the surgeon to place the grounding pad on the patient, to check and make sure that staff placed the pad correctly on the patient, or to keep track of the pad during the procedure, as the surgeon's focus is necessarily elsewhere. He also indicated that logistically, given that patients are draped for surgery, it is often not even possible to view the grounding pad.

Dr. Lederman testified that the standard of care does not require a surgeon to check the grounding pad for proper placement before commencing surgery. In his many years as a practicing surgeon, Dr. Lederman often saw fellow surgeons perform surgical procedures without checking to see whether the grounding pad was correctly placed on the patient. According to Dr. Lederman, "it's the nurse's responsibility" to apply the grounding pad to the

-3-

patient's skin. Nevertheless, Dr. Lederman himself always makes sure that the grounding pad was correctly placed on his patients. Dr. Lederman testified, "It's what I do" and "I double check it before the drape goes over the patient." He further emphasized that whenever he performs surgery, he "always double check[s] a grounding pad to make sure it is in proper position and it appears to be placed appropriately."[5] With respect to plaintiff's surgery, Dr. Lederman testified, "I inspected [the pad] before we draped."[6] Dr. Lederman additionally testified to his belief that "the pad was appropriately secured," and he suspected that "what probably happened" was that plaintiff shifted during the procedure, causing a fold in the grounding pad. Given his customary practice, Dr. Lederman "would have a very hard time believing that [the pad] wasn't applied correctly." Dr. Lederman explained that there is "constant movement" by patients during surgery, although he had no specific memory of plaintiff's moving during the procedure. Dr. Lederman recalled that he had experienced two other cases in his career where a patient suffered a burn at the site of a grounding pad.

During his deposition testimony, Dr. Kwartowitz did not address and was not even asked about the standard of care with respect to checking on or monitoring a grounding pad. He did testify that it is usually a nurse's responsibility to place a grounding pad on a patient. Dr. Kwartowitz observed that "once the patient is sterilely prepped and draped then you have no further visualization of the [grounding] pad or the electrical surgical unit." According to Dr. Kwartowitz, the grounding pad is "usually placed before the patient is sterilely prepped and draped." Sometimes Dr. Kwartowitz is in the operating suite when the prepping and draping take place and sometimes he is not; it depends on the day, time, and location of the surgery. In regard to plaintiff's surgery, Dr. Kwartowitz had no memory of looking at the grounding pad or where it was placed before the surgery. When asked who is responsible for the safety of a patient in connection with the use of electrocautery, Dr. Kwartowitz stated "that we all take a role to make sure the patient is safe during any surgical procedure."

---

[5] Dr. Lederman subsequently reiterated, "I don't proceed with the surgery unless I'm convinced the pad was applied correctly."

[6] But Dr. Lederman also testified as follows:

> *Q.* And you obviously have no recollection of checking the grounding pad, you're talking about your typical custom, routine and practice?
>
> *A.* That's correct.

He later stated that he did not "have a specific recollection" of checking the grounding pad. Dr. Lederman, however, then made an attempt to clarify his position, explaining:

> Do I remember checking that device, I think more than usual I recall that specifically, but I don't want to sit here and lie and tell you I have 100 percent memory of it so I'm struggling with that a little bit.

Plaintiffs commenced the medical malpractice action alleging, in part, that Drs. Lederman and Kwartowitz breached the standard of care by failing to ensure that the grounding pad had been appropriately secured to plaintiff's side. Defendants moved for partial summary disposition pursuant to MCR 2.116(C)(10), and the trial court denied defendants' motion in a written opinion and order. The court first determined that Michigan law and Dr. Corn's testimony reflected that a surgeon may delegate tasks to other operating room personnel, such as placing a grounding pad on a patient, but the surgeon remains responsible for actions by surgical staff. And delegating a task does not relieve the surgeon of the duty to perform the surgery within the standard of care. Thus, according to the trial court, "[d]efendants may have breached the applicable standard of care." The court next noted that defendants' expert testified that a breach of the standard of care would occur if a surgeon were to proceed with a surgery actually knowing that a grounding pad was not properly secured to the patient's body. The trial court then observed that Dr. Lederman testified that he always checks the grounding pad before commencing surgery; therefore, if Dr. Lederman "checked the . . . pad in this instance, he may have seen that it was placed incorrectly, and then his decision to proceed with surgery would have been a breach of the standard of care." The court concluded its opinion by ruling that there were genuine issues of material fact as to the applicable standard of care and whether it was breached.

The trial court denied defendants' subsequent motion for reconsideration. This Court then granted defendants' application for leave to appeal. *Charles Abdulkarim v Ronald S Lederman, MD*, unpublished order of the Court of Appeals, entered March 1, 2018 (Docket No. 341950).

This Court reviews de novo a trial court's ruling on a motion for summary disposition. *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 162; 809 NW2d 553 (2011). In *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013), this Court discussed the bedrock principles applicable to a motion for summary disposition brought under MCR 2.116(C)(10), stating:

> In general, MCR 2.116(C)(10) provides for summary disposition when there is no genuine issue regarding any material fact and the moving party is entitled to judgment or partial judgment as a matter of law. A motion brought under MCR 2.116(C)(10) tests the factual support for a party's claim. A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). A court may only consider substantively admissible evidence actually proffered relative to a motion for summary disposition under MCR 2.116(C)(10). [Citations and quotation marks omitted.]

"Like the trial court's inquiry, when an appellate court reviews a motion for summary disposition, it makes all legitimate inferences in favor of the nonmoving party." *Skinner v Square D Co*, 445 Mich 153, 162; 516 NW2d 475 (1994).

"The plaintiff in a medical malpractice action bears the burden of proving: (1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury." *Cox v Bd of Hosp Managers for the City of Flint*, 467 Mich 1, 10; 651 NW2d 356 (2002) (quotation marks omitted). Failure to establish any one of these four elements is fatal to a plaintiff's medical malpractice suit. *Id*. With respect to malpractice actions, MCL 600.2912a provides in relevant part as follows:

> (1) Subject to subsection (2), in an action alleging malpractice, the plaintiff has the burden of proving that in light of the state of the art existing at the time of the alleged malpractice:
>
> * * *
>
> (b) The defendant, if a specialist, failed to provide the recognized standard of practice or care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, and as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.
>
> (2) In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. . . . .

A plaintiff in a medical malpractice action must identify the claimed applicable standard of practice or care in his or her notice of intent to sue, MCL 600.2912b(4)(b), and affidavit of merit, MCL 600.2912d(1)(a).

Expert testimony is generally required to establish a medical malpractice claim. *Woodard v Custer*, 473 Mich 1, 6; 702 NW2d 522 (2005). "Expert testimony is necessary to establish the standard of care because the ordinary layperson is not equipped by common knowledge and experience to judge the skill and competence of the service and determine whether it meets the standard of practice in the community." *Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488, 492; 668 NW2d 402 (2003), citing *Locke v Pachtman*, 446 Mich 216, 223; 521 NW2d 786 (1994) ("This Court has long recognized the importance of expert testimony in establishing a medical malpractice claim, and the need to educate the jury and the court regarding matters not within their common purview."). Expert testimony is necessary to show "what a reasonably prudent surgeon would have done in [the defendant surgeon's] situation." *Locke*, 446 Mich at 229.

As gleaned by reviewing the testimony of plaintiffs' expert Dr. Corn, we note that the crux of plaintiffs' lawsuit is that the grounding pad was not properly applied to plaintiff's side before the surgery was begun, that the standard of care required Drs. Lederman and/or Kwartowitz to check the pad before starting the surgery, and that the standard of care was breached because either the pad was not checked before the surgery began or the pad was

checked and the inappropriate placement of the pad was ignored or not detected. Plaintiffs also claim liability on the basis that any negligence by the physician's assistant or whoever was delegated the job of placing the grounding pad on plaintiff was ultimately the legal responsibility of Drs. Lederman and Kwartowitz as the surgeons performing and overseeing the surgery.

Generally, the jury decides the question regarding the specific standard of care. *Johnson v Bobbie's Party Store*, 189 Mich App 652, 659; 473 NW2d 796 (1991). "[T]he specific standard of care . . . may not be withheld from the jury unless all reasonable minds could not differ, or some ascertainable public policy consideration requires protecting, and therefore encouraging, that conduct under any circumstances." *Lowe v Estate Motors Ltd*, 428 Mich 439, 460-461; 410 NW2d 706 (1987); see also *Case v Consumers Power Co*, 463 Mich 1, 9; 615 NW2d 17 (2000) (the general rule is that the jury "determines the specific standard of care owed by a defendant in a particular case"). M Civ JI 30.01 provides:

> It is for you to decide, based upon the evidence, what the ordinary [orthopedic surgeon] of ordinary learning, judgment or skill would do or would not do under the same or similar circumstances.

Given the conflicting expert testimony on the issue, we frame the question as whether the specific standard of care requires a surgeon to check the placement of a grounding pad before the start of surgery as one that needs to be resolved by a jury. Defendants rely heavily on Dr. Corn's testimony that checking a grounding pad before and at the end of surgery is not necessarily the standard of care. This reliance is misplaced because the question concerned checking the grounding pad before *and* after the surgery. Dr. Corn clearly testified, consistently with his affidavit of merit, that the standard of care required the two surgeons to ensure that the grounding pad had been appropriately secured or applied to plaintiff's body.[7] Dr. Corn did not mention that the standard of care encompassed checking the grounding pad at the end of the surgery. Moreover, and as noted earlier, Dr. Corn may have misunderstood the question as pertaining to the placement of a grounding pad.

There is, however, one point of clarification that must be made. At the beginning of his deposition, Dr. Corn confirmed that the averments in his affidavit of merit were and remained accurate. As stated earlier, in the affidavit of merit, Dr. Corn had opined that Drs. Lederman and Kwartowitz were required under the standard of care to ensure that the grounding pad was properly secured to plaintiff "*prior to and during the surgical procedure.*" (Emphasis added.) As Dr. Corn's testimony at his deposition evolved, he ultimately confined his claim of breach of the standard of care, within a reasonable degree of certainty, to the period before the surgery started. There was no longer an assertion of medical malpractice committed *during* the surgical

---

[7] We are at a loss to understand our dissenting colleague's assertion that Dr. Corn testified that the standard of care does not require a surgeon to check the placement of the grounding pad before surgery. As reflected in our discussion of the facts, this assertion is simply inaccurate; Dr. Corn specifically testified to the contrary. The dissent appears to solely rely on that part of Dr. Corn's testimony that the dissent takes out of context. See footnote 4 above.

procedure.[8] Indeed, Dr. Corn testified that it is very difficult for a surgeon to even view the grounding pad during surgery. Accordingly, plaintiffs' suit is limited to the claim that the standard of care was breached at the commencement of the surgery.

Starting from the point that the trier of fact will need to determine the extent of the standard of care, we conclude that summary disposition was properly denied. Assuming that the standard of care did require Drs. Lederman and Kwartowitz to check the placement of the grounding pad at the beginning of the surgery, we note that Dr. Kwartowitz made no claim that he had done so, thereby breaching the presumed standard of care. With respect to Dr. Lederman, if we accept that he in fact checked the grounding pad, a malpractice claim can still be made on the basis that he did so negligently by failing to identify, or by ignoring, an improperly applied grounding pad. Dr. Corn opined that the grounding pad had not been correctly secured to plaintiff's side at the start of the surgical procedure. He reached this conclusion because the pad was found puckered and not intact with plaintiff's skin, and because, in Dr. Corn's view, neither movement by plaintiff nor anything else could be identified as a contributing factor to the state of the pad. Dr. Corn's deposition testimony was sufficient to create an issue of fact with respect to whether the grounding pad was appropriately placed on plaintiff and whether Dr. Lederman missed or ignored the improper placement. Accordingly, the trial court did not err in denying the motion for summary disposition.[9] Moreover, considering our ruling, it becomes unnecessary to address the issue whether Drs. Lederman and Kwartowitz, having delegated the placement of the grounding pad to operating room staff, can be held liable for any negligent actions committed by surgical personnel in placing or applying the pad.

We affirm. Having fully prevailed on appeal, plaintiffs are awarded taxable costs under MCR 7.219.

/s/ Jane E. Markey

---

[8] There was no evidence that either Dr. Lederman or Dr. Kwartowitz became or were made aware of a problem with the placement of the grounding pad during the surgery.

[9] The dissent does not acknowledge nor apply the principles that govern a motion for summary disposition brought under MCR 2.116(C)(10). Summary disposition pursuant to MCR 2.116(C)(10) is only proper if "there is no genuine issue as to any material fact[.]" Again, "[l]ike the trial court's inquiry, when an appellate court reviews a motion for summary disposition, it makes all legitimate inferences in favor of the nonmoving party." *Skinner*, 445 Mich at 162. Viewed in a light most favorable to plaintiffs, the evidence did not support summary dismissal of the suit.