*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ANISE PATTERSON, Individually and as Personal
Representative of the ESTATE OF RONALD D.
PATTERSON,

UNPUBLISHED
June 13, 2024

Plaintiff-Appellant,

v

No. 364469
Washtenaw Circuit Court
LC No. 19-000002-NH

ST. JOSEPH MERCY HOSPITAL ANN ARBOR,
TRINITY HEALTH-MICHIGAN, INTERNAL
MEDICINE SPECIALISTS OF HOWELL, PLLC,
and GERALD DRESLINSKI, M.D.,

Defendant-Appellees,

and

ST. JOSEPH MERCY HOSPITAL MEDICAL
GROUP PRACTICE, JULIE SIDELINGER, PA,
JOHN DOE(S), and JANE DOE(S),

Defendants.

Before: MURRAY, P.J., and RIORDAN and D. H. SAWYER*, JJ.

PER CURIAM.

This is a professional negligence action that returns to this Court for a second time.[1]
Plaintiff, Anise Patterson, individually and as personal representative of the Estate of Ronald

---

[1] See *Patterson v St Joseph Mercy Hosp Ann Arbor*, unpublished per curiam opinion of the Court
of Appeals, issued October 28, 2021 (Docket No. 352631).

---

*Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

-1-

Patterson, appeals from a final order granting summary disposition in favor of defendants Dr. Gerald Dreslinski and Internal Medical Specialists of Howell (the IMS defendants). Plaintiff also appeals the trial court's earlier order granting summary disposition in favor of St. Joseph Mercy Hospital-Ann Arbor (SJM-AA) and Trinity Health-Michigan (together, the SJM defendants). On appeal, plaintiff argues that the trial court erred by concluding that she did not present evidence sufficient to establish the element of causation. She also raises several challenges to the trial court's rulings on discovery matters, and contends that the trial court erred by prematurely setting a trial date. For reasons stated herein, we affirm the trial court's orders granting summary disposition in favor of the SJM and IMS defendants.

## I. BACKGROUND

Ronald Patterson arrived at the emergency department of SJM-AA on January 25, 2015, with acute gastrointestinal bleeding and low blood pressure. Patterson[2] had recently been found to suffer from atrial fibrillation, and his medical history included recent nosebleeds "with exposure to Xarelto," anemia, and risks of "internal bleeding and severe hemorrhage." Patterson went into cardiac arrest at approximately 1:30 p.m. Medication intended to be administered intravenously escaped into the surrounding tissue of Patterson's arm, an event referred to as an "extravasation," causing a "full-thickness" wound. The wound became infected, and Patterson had to undergo skin grafts.[3] Patterson was released from SJM-AA on February 16. On March 29, Patterson developed fever, confusion, and weakness, and was admitted to SJM-AA the following day. On April 1, Patterson became increasingly hypoxic and required a ventilator; he was intubated early on April 2. Increasing difficulty oxygenating and ventilating was noted; Patterson died at 6:00 p.m. on April 3.

In January 2019, plaintiff filed a four-count wrongful-death action predicated on allegations of medical malpractice.[4] Plaintiff's malpractice claims against the SJM defendants generally alleged that nurses at SJM-AA negligently inserted, monitored, and responded to the IV in Patterson's arm from which epinephrine and calcium gluconate escaped into the tissue surrounding the IV site. Plaintiff's malpractice claims against the IMS defendants generally alleged that Dr. Dreslinski's prescription of the anticoagulant, Xarelto, caused or contributed to the massive internal bleeding that brought Patterson to the hospital on January 25, 2015. During discovery, plaintiff sought the metadata/audit trail of Patterson's medical records, believing that it would allow her to discover the facts about Patterson's severe extravasation injury and would explain what she believed were errors in, and omissions from, the 7,000 pages of medical records that SJM-AA provided. At the same time, the SJM defendants and the IMS defendants repeatedly asked plaintiff to identify her expert witnesses and to provide deposition dates for them. By November, plaintiff still had not provided deposition dates for any expert witnesses or for two lay witnesses, nor had she deposed Dr. Dreslinski or the healthcare providers made available to them

---

[2] Herein, "Patterson" refers exclusively to the decedent, Ronald Patterson.

[3] *Patterson*, unpub op at 2.

[4] The trial court eventually dismissed from the lawsuit the named and unnamed individual SJM defendants, as well as St. Joseph Hospital Group Practice.

by the SJM defendants.[5] After plaintiff's attorney failed to appear at two hearings that were supposed to get the case back on track, the trial court dismissed the case without prejudice as a sanction.

Plaintiff appealed and this Court vacated the order dismissing plaintiff's complaint and "remand[ed] for explicit consideration on the record of the factors under *Dean v Tucker*, 182 Mich App 27, 32-33; 451 NW2d 571 (1990), and whether a lesser sanction might better serve the interests of justice."[6] On remand, after holding a hearing to consider the *Dean* factors, the trial court again dismissed plaintiff's complaint without prejudice for the reasons stated on the record. Concluding that the trial court did not follow its remand instructions, this Court, on its own motion, vacated the trial court's order dismissing plaintiff's complaint and again remanded to the trial court with the same remand instructions.[7]

The proceedings and rulings on the second remand are the subject of the present appeal. After the case returned to the trial court a second time, the court revoked its December 3, 2019 order of dismissal, reopened the case, and ordered a scheduling conference on May 5, 2022. When plaintiff's attorney did not appear in person, but sent an attorney unfamiliar with the case to cover, the trial court rescheduled the scheduling conference for May 17. Pressed by the trial court to identify plaintiff's expert witnesses, plaintiff's attorney named Dr. Steven L. Anton, a physician board-certified in cardiology and in internal medicine, and Patricia Bartzak, D.P.N., R.N. The trial court granted the IMS defendants' request to limit plaintiff's experts to these two, but the trial court left open the door for plaintiff to add experts upon a showing of good cause. The trial court set a status conference for July 17. A corresponding order was entered under the seven-day rule, MCR 2.602(B)(3), on May 25, 2022.

On June 24, 2022, counsel for the IMS defendants deposed Dr. Anton, focusing his questions primarily on the characteristics of Xarelto, the decision to put Patterson on Xarelto and to resume Xarelto after a brief hiatus, and the role of Xarelto in the massive bleed that Patterson experienced on January 25. At his deposition, Dr. Anton testified that Xarelto increased the time it took for blood to clot and helped prevent blood clots. At the same time, Xarelto "absolutely" increased the risk of bleeding. Dr. Anton acknowledged that Dr. Sunil Bhatia, Patterson's cardiologist, initially prescribed Xarelto to address Patterson's risk of stroke. Although he did not criticize Dr. Bhatia's initial decision, Dr. Anton stated that Dr. Bhatia did not have all the medical history and information he needed to determine whether the prescription was appropriate, and he faulted Dr. Bhatia for not ordering lab work to aide in further evaluation.

Dr. Bhatia prescribed Xarelto on January 7, 2015. When Patterson presented to Dr. Dreslinski on January 12 with nosebleeds, Dr. Dreslinski sent him to the emergency room. The medical records show that emergency room personnel halted the Xarelto. On January 20,

---

[5] *Patterson*, unpub op at 2-3.

[6] *Patterson*, unpub op at 2; see also *id*. at 12.

[7] *Estate of Ronald D Patterson v St Joseph Mercy Hosp Ann Arbor*, unpublished order of the Court of Appeals, entered April 21, 2022 (Docket No. 352631).

-3-

Dr. Dreslinski restarted Xarelto at a reduced dosage. Dr. Anton testified that it had not been necessary to titrate Xarelto on the basis of nosebleeds. He testified, however, that the increased risk of bleeding that came with Xarelto outweighed the benefit of the drug to Patterson. He believed that Patterson's risk factors—his history of hypertension, alcoholism, and severe anemia, as well as a prior gastrointestinal bleed—should have signaled that putting him back on Xarelto would increase his risk of bleeding.

Dr. Anton agreed that if Dr. Dreslinski had not reinitiated Xarelto, Patterson would have been at increased risk of stroke; however, he also believed that Xarelto significantly increased Patterson's risk of bleeding. Asked if he would agree that Xarelto "did not cause" the massive bleed, Dr. Anton stated, "We don't know that." Continuing, he said that Xarelto was "temperately"[8] related to Patterson's massive bleed, but "whether it caused or exacerbated how much bleeding he got is undetermined." Asked what led to the bleed, Dr. Anton said, "That's a good question isn't it?" The gastroenterologist assumed that the bleed came from the gastric varices, which Dr. Anton testified were caused by splenic vein thrombosis. Dr. Anton said that he believed that it was possible—even probable—that Patterson's bleed came from the gastric varices, but the source of the bleed could not be determined definitively; he could not even say whether it was more likely than not that the bleeding came from the gastric varices. Dr. Anton agreed that Xarelto caused neither the splenic vein thrombosis nor the gastric varices.

Counsel for the SJM defendants deposed Dr. Anton about Patterson's treatment at SJM-AA. Dr. Anton testified that he was not asked to give an opinion on the care that Patterson received at SJM-AA. He did not review the Code Blue Sheet and had no intention of giving an opinion about how the code was performed. Similarly, Dr. Anton said that he was not asked to look at the records about the extravasation. Therefore, he had no opinion regarding how the IV catheter ended up outside the vascular system, the treatment and progress of the extravasation injury, or how the extravasation injury contributed to Patterson's death. Dr. Anton stated that he had no opinion regarding Patterson's cause of death.

When the deposition of plaintiff's nursing expert could not be arranged, the trial court granted plaintiff's motion to amend her witness list and add Emily Moore (nee Jackson), R.N., as her nursing expert. Counsel for the SJM defendants took Moore's deposition on September 9, 2022. Moore indicated that she did not see any violations of the standard of care during the code. She said that fluids run wide open during a code and can push a catheter out of place, even if it is secured. That an extravasation would occur during a code is not a sign of negligence, it is simply a risk of coding. Nothing in the records indicated that any of the nurses, physicians, or staff involved in the code saw signs or symptoms of an extravasation, and she has no opinion about a violation of the standard of care during the code. She said that, according to the medical records, the nurses did not use the suspect IV location after the code.

---

[8] Both parties believe the word "temperately" to be an error in transcription, but they disagree as to what Dr. Anton might reasonably have said. Plaintiff suggests that he said "temporarily," while the IMS defendants suggest that he said "temporally."

Moore opined that the biggest failure occurred after the extravasation, when nurses noticed the swelling on Patterson's arm, detected that he was in pain, but failed to take timely action. Moore testified that nurses should have recognized an extravasation injury and begun to treat it at approximately 5:00 p.m. on January 25. When nurses saw that Patterson was in pain, knew that he had coded and had received vesicants in an IV, and knew that there was pain at the IV site, they should have suspected an extravasation injury and started treatment immediately. They should have elevated his arm, contacted the pharmacy for the antidote, and contacted the physician. Moore also criticized the nurses' documentation. She acknowledged that an entry in the records at approximately 4:50 p.m. on January 26 documented that Patterson was in pain, but recorded a zero on the pain scale. Forty-five minutes later, the dermatologist noted extreme tenderness, swelling, and a blister. Moore testified that extravasation injuries typically take time to develop, but she found it hard to believe that Patterson's condition would develop from a zero on the pain scale to what the dermatologist saw in just 45 minutes.

Moore did not have an opinion regarding the extent to which damage to the arm would have been reduced had the antidote been administered on the evening of January 25, but she believed that it was "probable that it would have been less." How much less she could not say. She did not know how effective antidotes were or whether the antidote actually used on Patterson was more or less effective than the antidote that the nurses wanted to use, but she had never experienced a case in which the timely use of an antidote still resulted in an extensive injury. Moore could not say for sure that the extravasation injury had anything to do with Patterson's death; she agreed that she was not a doctor and that, in a hospital setting, she would rely on a physician to determine whether a skin injury caused or contributed to a patient's death.

The SJM defendants moved for summary disposition under MCR 2.116(C)(10), arguing that they were entitled to summary disposition because plaintiff failed to establish through expert medical testimony that Patterson's extravasation injury proximately caused his death or that earlier diagnosis and treatment of the injury would have made the injury less severe. Plaintiff responded that Dr. Richard Beil's statement in his plastic surgery consultation report that the epinephrine and calcium gluconate that extravasated from Patterson's IV caused a wound, and Dr. Alice Watson's statement in her dermatological consultation report that the wound to Patterson's right arm was an extravasation injury, "satisfie[d] reliable medical expert opinion of causation in this matter."

The IMS defendants also moved for summary disposition under MCR 2.116(C)(10) on the basis that no record evidence established that restarting Patterson on Xarelto had any negative impact on Patterson's already debilitated condition. They asserted that plaintiff lacked the required expert testimony to establish that Xarelto more probably than not was a cause of Patterson's massive bleed on January 25. They recalled that Dr. Anton had no opinion on Xarelto's effect on Patterson's splenic vein thrombosis and the resulting bleed, was unable to say whether Xarelto caused the bleed or would have prevented the formation of a clot, and agreed that Xarelto caused neither Patterson's splenic vein thrombosis or gastric varices. In response, plaintiff stressed Dr. Anton's testimony that Xarelto absolutely increased the risk of bleeding, that Patterson's massive bleed was "temperately" related to Xarelto, that Xarelto inhibited clot formation, that Xarelto significantly increased Patterson's risk of bleeding, and that Patterson's risk factors signaled that the risk of taking Xarelto outweighed its benefits. On the basis of this, plaintiff concluded that "Dr. Anton clearly testified that the Xarelto caused the [gastrointestinal] bleed which satisfies reliable medical expert opinion of causation in this matter."

After hearing oral argument on both motions, the trial court impliedly found relative to the IMS defendants that Dr. Anton testified that he did not know whether Xarelto caused the bleed, and he conceded that other causes were possible. The trial court also impliedly found that Dr. Anton conceded that Xarelto may have prevented the condition that likely caused the bleed, but he offered no opinion on that question because he did not treat splenic thrombosis. From this, the court concluded that plaintiff had not met her burden to provide expert medical testimony regarding causation and granted summary disposition in favor of the IMS defendants.

As to the SJM defendants, the trial court noted that Moore found no standard-of-care violations during the code and that she was not qualified under Michigan law to offer a medical opinion on Patterson's cause of death. Dr. Anton did not offer an opinion on Patterson's cause of death. Without a medical opinion linking Patterson's extravasation injury to his cause of death, plaintiff could not sustain her wrongful-death claim.

As to the effect of alleged delays in the treatment of Patterson's extravasation injury, the trial court agreed with the SJM defendants regarding the limitations of Moore's review and the fact that she had no opinions on Patterson's pain and suffering damages, lifetime expectancy, or changes in his activity level. The court also noted that Dr. Anton had no opinion on the treatment of Patterson's extravasation injury. Finding that plaintiff failed to provide the medical opinions required to sustain her claims regarding the result of alleged delays in treatment, the trial court granted summary disposition in favor of the SJM defendants on this issue. The trial court memorialized its ruling in an order issued December 22, 2022. Plaintiff now appeals.

## II. STANDARD OF REVIEW

Defendants moved for summary disposition under MCR 2.116(C)(10), and the trial court granted summary disposition under that subrule. A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 206; 815 NW2d 412 (2012). A trial court considering a motion for summary disposition under Subrule (C)(10) "considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties . . . in the light most favorable to the [nonmovant]." *Maiden v Rozwood*, 461 Mich 109, 119-120; 597 NW2d 817 (1999). The moving party has the initial burden to identify "the issues as to which the moving party believes there is no genuine issue as to any material fact." MCR 2.116(G)(4). See also *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 9; 890 NW2d 344 (2016). The moving party may satisfy its burden in two ways: "by 'submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim,' *or* by 'demonstrat[ing] to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.' " *Id*. at 7, quoting *Quinto v Cross and Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996) (alterations in original). Summary disposition is appropriate when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10).

## III. LEGAL STANDARDS

Plaintiff filed a wrongful-death action grounded in medical malpractice. A wrongful-death action requires: (1) a death; (2) that the death be caused by the wrongful act, neglect, or fault of

another; and (3) that the wrongful act, neglect, or fault of another was such that, had death not occurred, a cause of action could have been filed against the responsible party and damages recovered from them. MCL 600.2922(1); *Simpson v Alex Pickens, Jr, & Assoc, MD, PC*, 311 Mich App 127, 136; 874 NW2d 359 (2015). To establish medical malpractice, a plaintiff bears the burden of proving: "(1) the applicable standard of care, (2) breach of that standard of care by the defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury." *Locke v Pachtman*, 446 Mich 216, 222; 521 NW2d 786 (1994). "Failure to prove any one of these elements is fatal." *Wischmeyer v Schanz*, 449 Mich 469, 484; 536 NW2d 760 (1995).

The trial court granted the SJM defendants' motion for summary disposition on the basis that plaintiff failed to establish proximate cause. " 'Proximate cause' is a legal term of art that incorporates both cause in fact and legal (or 'proximate') cause." *Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004). The cause-in-fact prong, also referred to as "but-for" cause, "generally requires showing that 'but for' the defendant's actions, the plaintiff's injury would not have occurred," while the legal-causation prong "relates to the foreseeability of the consequences of the defendants' conduct." *O'Neal v St John Hosp & Med Ctr*, 487 Mich 485, 496; 791 NW2d 853 (2010) (quotation marks and citation omitted).

A valid theory of causation must be based on record evidence and "exclude other reasonable hypotheses with a fair amount of certainty." *Craig*, 471 Mich at 87-88 (quotation marks and citation omitted). A plaintiff need not prove that the alleged negligence was the *sole* cause of his injuries, but the plaintiff "must introduce evidence permitting the jury to conclude that the act or omission was *a* cause." *Id*. at 87. A plaintiff establishes that the defendant's conduct was a but-for cause of his or her injuries only if the plaintiff "set[s] forth specific facts that would support a reasonable inference of a logical sequence of cause and effect." *Id*. (quotation marks and citation omitted). The causal link between the alleged negligence and the injury must be established to a reasonable degree of medical certainty, which is to say that testimony must establish that the negligence more likely than not resulted in the injury. See *Weymers v Khera*, 454 Mich 639, 647-648; 563 NW2d 647 (1997) (proximate causation is evaluated under a more probable than not standard).

Expert testimony is generally required to establish causation in a medical malpractice action. *Kalaj v Khan*, 295 Mich App 420, 429; 820 NW2d 223 (2012); see also *Thomas v McPherson Comm Health Ctr*, 155 Mich App 700, 705; 400 NW2d 629 (1986) (indicating that "in an action for malpractice against a hospital, expert testimony is required to establish the applicable standard of conduct, the breach of that standard, and causation").

## A. THE SJM DEFENDANTS

Plaintiff contends that the trial court erred by granting summary disposition in favor of the SJM defendants on the basis that plaintiff did not establish that the critical care nurses' delayed recognition and response to Patterson's extravasation injury was a proximate cause of an increase in Patterson's pain and suffering and, eventually, of his death.

Viewing the evidence in the light most favorable to plaintiff, see *Maiden*, 461 Mich at 120, the trial court did not err by granting summary disposition of plaintiff's wrongful-death claim in favor of the SJM defendants. Plaintiff failed to meet her burden to set forth specific facts to

establish a causal nexus between the extravasation, the SJM-AA nurses' alleged untimely response to the extravasation, and Patterson's death. See *Craig*, 471 Mich at 87. Dr. Anton testified that he was not asked to evaluate the records regarding the extravasation injury or to opine on the cause(s) of Patterson's death, and Moore was a registered nurse who did not practice medicine and, therefore, was not qualified to render an expert medical opinion regarding whether the extravasation injury caused or contributed to Patterson's death. See *Cox ex rel Cox v Bd of Hosp Managers for City of Flint*, 467 Mich 1, 19; 651 NW2d 356 (2002) ("Nurses do not engage in the practice of medicine."). In any event, Moore testified that she did not look at any records beyond February 16, 2015, could not say for sure that the extravasation injury had anything to do with Patterson's death, and would typically rely on a physician to determine whether a skin injury contributed to a patient's death. Assuming for the sake of argument that the SJM-AA nurses breached the applicable standard of care, plaintiff failed to establish the second requirement of a wrongful-death action, i.e., that Patterson's death was caused by their breach. See *Simpson*, 311 Mich App at 136. Accordingly, the trial court did not err by granting summary disposition of plaintiff's wrongful-death claim in favor of the SJM defendants. See *Lowrey*, 500 Mich at 7.

The trial court also did not err by granting the SJM defendants' motion for summary disposition of plaintiff's claim that the SJM defendants were liable for the pain and suffering caused by the worsening of Patterson's extravasation injury attributable to the nurses' failure to timely respond to the extravasation. The trial court again found that plaintiff failed to establish the element of proximate cause. As already indicated, Dr. Anton testified that he was not asked to, nor did he, evaluate the medical records about the extravasation. Therefore, he offered no expert medical opinion regarding the link between the SJM-AA nurses' alleged negligence and the severity of Patterson's extravasation injury.

Moore testified that she did not know whether a timely response would have lessened the extent of Patterson's extravasation injury, but she thought that it probably would have. She also did not know how effective antidotes were or whether the antidote actually used on Patterson was more or less effective than the antidote that the nurses wanted to use. Moore knew what the standard of care required, and her experience told her that timely responses could lessen skin damage from an extravasation. However, she could not provide any testimony specific to the effect of delay on Patterson's injury or even whether the available antidote, had it been obtained earlier, would have lessened the damage to Patterson's arm. For this, expert medical testimony was likely required.

Plaintiff contends that Dr. Beil's and Dr. Watson's observations that the wound on Patterson's arm was caused by extravasation constituted reliable medical expert opinion of causation. However, these observations did not go to the causation question at hand. There is no dispute that an extravasation injury occurred; at issue is whether the SJM-AA nurses' allegedly delayed response more probably than not resulted in the extent of the injury. The reports from Dr. Beil and Dr. Watson do not answer this question.

In conclusion, there is no dispute that the injury to Patterson's arm was caused by an extravasation, and the picture of Patterson's injury leaves no reasonable room to doubt that it was significant. Michigan medical malpractice jurisprudence requires plaintiff to have expert medical testimony to establish that the nurses' alleged negligence caused the worsening of Patterson's extravasation injury and the resultant pain and suffering. In the absence of expert testimony to

establish causation, plaintiff cannot show that the trial court erred by granting summary disposition in favor of the SJM defendants.

## B. THE IMS DEFENDANTS

Plaintiff also contends that the trial court erred by granting summary disposition in favor of the IMS defendants because she did not establish that Dr. Dreslinski's resuming Patterson's Xarelto prescription, although at a lower dosage, was a proximate cause of Patterson's massive gastrointestinal bleed on January 25 and, eventually, of his death.

To establish that Dr. Dreslinski committed medical malpractice, plaintiff had to prove: "(1) the applicable standard of care, (2) breach of that standard of care by the defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury." *Locke*, 446 Mich at 222. To establish wrongful death on the basis of medical malpractice, plaintiff had to show that but for Patterson's death, he could have filed a cause of action against the IMS defendants and recovered damages from them. See MCL 600.2922. At issue is whether plaintiff met her burden to establish that Dr. Dreslinski's restarting Patterson's Xarelto prescription was more likely than not a cause of Patterson's January 25 bleed and eventual death. See *Weymers*, 454 Mich at 647-648.

Dr. Anton's testimony did not create a factual dispute that it was more likely than not that Xarelto was a cause of Patterson's bleed. Dr. Anton indicated that although it was not clear how Xarelto factored into the bleed, Xarelto increased Patterson's risk of bleeding significantly, and he could not rule out Xarelto as a cause of the bleed. But he could not say that Xarelto was a cause of the bleed; he asserted that Xarelto was "temperately related to the bleed," but whether it caused the bleed or exacerbated the amount of bleeding was undetermined.[9] Plaintiff contends that Dr. Anton's testimony that Xarelto is "related to" Patterson's gastrointestinal bleeding satisfied reliable medical expert opinion of causation, but cites no authority for this assertion, and we find it insufficient. Furthermore, although Dr. Anton's testimony established a correlation between Xarelto and Patterson's internal bleeding, correlation is not causation. See *Craig*, 471 Mich at 93.

According to Dr. Anton, other medical conditions might reasonably be the cause of Patterson's bleeding. He testified that, although the source of the bleed could not be definitively determined, it was probable that the bleeding came from Patterson's gastric varices, which were caused by Patterson's splenic vein thrombosis. Splenic vein thrombosis could be induced by pancreatitis, and Patterson had a history of pancreatitis. Neither Patterson's splenic vein thrombosis nor gastric varices were caused by Xarelto. In light of the foregoing, we conclude that Dr. Anton's testimony did not "exclude other reasonable hypotheses with a fair amount of certainty." *Ykimoff v Foote Mem Hosp*, 285 Mich App 80, 87; 776 NW2d 114 (2009) (quotation marks and citations omitted).

The testimony of plaintiff's medical expert established only a correlation between Xarelto and Patterson's internal bleeding and failed to exclude other reasonable hypotheses regarding the

---

[9] Both parties believe that "temperately" was a transcribing error. The IMS defendants believe that the word should have been "temporally," while plaintiff believes that the word should have been "temporarily."

bleeding with a fair amount of certainty. Accordingly, plaintiff failed to establish that, but-for Dr. Dreslinski's resumption of Patterson's Xarelto prescription, Patterson would not have suffered internal bleeding on January 25. Without establishing that Dr. Dreslinski committed medical malpractice, plaintiff cannot sustain a wrongful-death action against the IMS defendants. We conclude, therefore, that the trial court did not err by granting summary disposition of plaintiff's claims in favor of the IMS defendants.

Plaintiff raises a number of other challenges to several of the trial court's discovery rulings and to the setting of a trial date that plaintiff believed was premature. In light of our disposition of plaintiff's challenges to the trial court's summary disposition orders, we need not discuss plaintiff's other claims of error.[10]

Affirmed.

/s/ Christopher M. Murray
/s/ Michael J. Riordan
/s/ David H. Sawyer

---

[10] The only claim of error which could have had an effect on the trial court's summary disposition rulings is plaintiff's argument that the trial court erred by prohibiting her from adding any witnesses to her 2019 witness list. Contrary to plaintiff's assertion, however, the trial court had the discretion to prohibit all parties from adding new witnesses except upon good cause shown. To that point, upon a showing of good cause, the trial court did allow plaintiff to add a new nursing expert when the deposition of her previous nursing expert could not be arranged, and plaintiff did not seek to add any other expert witnesses.