*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RITA WALSH and GARY WALSH,

Plaintiffs-Appellees,

v

MARC SAKWA, M.D., and WILLIAM
BEAUMONT HOSPITAL,

Defendants-Appellants,

and

SOUTHEASTERN MICHIGAN
CARDIOVASCULAR SURGEONS PLLC,

Defendant.

UNPUBLISHED
July 08, 2025
12:14 PM

No. 356517
Oakland Circuit Court
LC No. 2016-155529-NH

## ON REMAND

Before: GADOLA, C.J., and BORRELLO and M. J. KELLY, JJ.

PER CURIAM.

This interlocutory appeal returns to this Court on remand from our Supreme Court for reconsideration in light of that Court's decision in *Danhoff v Fahim, M.D.*, 513 Mich 427; 15 NW3d 262 (2024). Upon reconsideration, we again reverse the trial court's order denying defendants' motion to exclude the testimony of Dr. Samuels and remand for entry of an order granting defendants' motion.

## I. FACTS

This is a case alleging medical malpractice. Plaintiffs, Rita and Gary Walsh, claim that defendant, Marc Sakwa, M.D., breached the standard of care when performing a minimally invasive mitral-valve-repair surgery on Rita Walsh at defendant William Beaumont Hospital on

June 25, 2013.  When this case was initially before this Court, we summarized the pertinent facts as follows:

> During a minimally invasive mitral-valve-repair surgery, the surgeon makes an incision in the side of the patient's chest to access the heart.  Once the surgeon has access to the heart, he makes an incision to the left atrium, near the right atrium.  A Swan-Ganz catheter runs through the right atrium, and is used to monitor a patient's blood pressure/flow during surgery.  The surgeon never sees inside the right atrium, and therefore never sees the Swan-Ganz catheter.  After the surgeon finishes repairing the mitral valve, the surgeon has to close the left atrium by suturing it.  During Rita's surgery, the Swan-Ganz catheter was apparently sitting in the right atrium near where Dr. Sakwa was suturing the left atrium, and Dr. Sakwa stitched the Swan-Ganz catheter into Rita's heart.
>
> After suturing the left atrium, Dr. Sakwa asked the anesthesiologist to move the Swan-Ganz catheter to ensure that it was not entrapped, and the anesthesiologist reported that the Swan-Ganz catheter moved freely.  However, after closing the incision in the side of Rita's chest, the anesthesiologist reported that he was no longer able to move the Swan-Ganz catheter, so Dr. Sakwa had to perform emergency open-heart surgery to free the catheter.  [*Walsh v Sakwa*, unpublished per curiam opinion of the Court of Appeals, issued June 13, 2019 (Docket No. 341131), p 2.]

In 2022, this case returned to this Court as an interlocutory appeal of the trial court's order denying defendants' motion to exclude the testimony of plaintiffs' expert witness.  In an opinion reversing the order of the trial court and remanding for entry of an order granting defendants' motion, we summarized the events that followed the surgery as follows:

> Plaintiffs filed a complaint alleging medical malpractice by Dr. Sakwa, asserting that he breached the standard of care by suturing the Swan-Ganz catheter into Rita's heart, causing Rita additional pain and suffering and additional medical procedures as a result of the consequent open-heart surgery.  The complaint also alleged loss of consortium on behalf of Rita's husband, plaintiff Gary Walsh, as a result of the alleged malpractice.  Before the trial court, plaintiffs proffered the expert testimony of Dr. Louis Samuels, M.D., to establish the relevant standard of care.  In the Affidavit of Merit accompanying the complaint, Dr. Samuels stated that the standard of care applicable in this case required Dr. Sakwa to:
>
> > a. Refrain from suturing the Swan Ganz catheter into the suture line of the heart;
> >
> > b. Properly place sutures into the heart tissue, taking care to avoid placing stitches into or around the Swan Ganz catheter;
> >
> > c. Properly identify patient anatomy and the location of the Swan Ganz catheter when suturing the heart;

d. Properly perform Mrs. Walsh's surgical procedure to avoid suturing the Swan Ganz catheter into the suture line of the heart;

e. Ensure the Swan Ganz catheter is not sutured into the suture line of the heart before closing the patient;

f. Any and all other standard of care violations, which may become known throughout the course of discovery in this matter.

During discovery, the parties deposed Dr. Samuels, who testified that "the standard of care of the operation is not to entrap the catheter." He also testified that entrapping the catheter during a minimally invasive mitral-valve-repair procedure is a rare occurrence that could not happen absent negligence. When pressed regarding his conclusion that suturing the catheter is always a breach of the standard of care, he testified that the reason was simply that suturing the catheter is not within the standard of care. Dr. Samuels testified that he had reviewed only one article on the subject of Swan-Ganz catheter entrapment before testifying.

Defendants moved to exclude Dr. Samuels' testimony on the basis that plaintiffs had not demonstrated that his testimony was reliable as required under MRE 702 and MCL 600.2955. The trial court denied defendants' motion without holding a *Daubert*[1] hearing or discussing the factors listed in MCL 600.2955(1). This Court granted defendants leave to appeal and thereafter vacated the trial court's order and remanded the matter, directing the trial court either to explain its reasoning why it found Dr. Samuels' testimony reliable, specifically addressing the factors set forth in MCL 600.2955(1), or to hold a *Daubert* hearing. *Walsh*, unpub op at 5.

On remand, the trial court did not explain its reasoning for finding Dr. Samuels' testimony reliable, nor did it hold a *Daubert* hearing. Instead, the trial court denied defendants' motion to exclude Dr. Samuels' testimony after hearing counsels' arguments. Defendants again sought leave to appeal, challenging the trial court's order. In lieu of granting leave to appeal, this Court vacated the trial court's order and remanded the matter to the trial court directing the trial court to comply with this Court's earlier order either to state its reasoning regarding why it found Dr. Samuels' testimony reliable, specifically addressing the factors set forth in MCL 600.2955(1), or to hold a *Daubert* hearing. *Walsh v Sakwa*, unpublished order of the Court of Appeals, entered April 21, 2020 (Docket No. 352094).

The trial court thereafter held a *Daubert* hearing, at which Dr. Samuels testified that Dr. Sakwa breached the standard of care by ensnaring the Swan-Ganz catheter during the procedure. He testified that although the surgeon cannot see the catheter during a minimally invasive mitral-valve-repair procedure, the surgeon must "know exactly the depth of where that needle is going," and that the stitching

---

[1] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

should never cross through the right atrium.  He opined that "[t]here are certain principles in surgery . . . and one of them is to know exactly where the needle, the knife, whatever instrument you're using, where it's going."  Dr. Samuels testified that under the facts of this case, Dr. Sakwa violated the standard of care by suturing the catheter.

Dr. Samuels testified that three articles supported his opinion regarding the standard of care: the Kaplan article, the Kansara article, and the Vucins article.[2]  Dr. Samuels testified that the Kaplan article supported his opinion that ensnaring the Swan-Ganz catheter is a breach of the standard of care, stating in pertinent part:

> Yeah, it did support my conclusion.  And rather than paraphrase, I'll just read the conclusion because it's exactly in support of what I've been talking about, and that is to say:

> When performing open heart surgery, the surgeon should not leave the Swan-Ganz catheter in the suture while closing the right or left atriotomy, or during venous cannulation.  In addition, the catheter should be move[d] after suturing to ensure that there is no entrapment.

> That's exactly what I've been talking about.

Dr. Samuels testified that the Kansara article also supported his opinion because it discussed the circumstance of a deep stitch accidentally catching a Swan Ganz catheter.  Dr. Samuels testified that although the Kansara article discussed stitching in a different structure of the heart, the superior vena cava, "the support is in the concept of the deep stitch catching the catheter.  And the defense attorney is correct, it's a different location, but the concept is the same.  The deep stitch is what caused the catheter to be entrapped, and that's not supposed to happen."  Dr. Samuels indicated that the Vucins article also supported his opinion.

Dr. Samuels acknowledged that none of the articles specifically state that a surgeon breaches the standard of care when ensnaring the catheter, but opined that a surgeon doing so was so obviously negligent that no literature directly stated that fact.  Dr. Samuels also testified that he polled seven of his current or former colleagues, and six agreed that it was a breach of the standard of care for a surgeon

---

[2] See Mehmet Kaplan, M.D., et al., *Swan-Ganz Catheter Entrapment in Open Heart Surgery*, 15 J. Cardiac Surgery 313 (2000) (the Kaplan article); Bhuvnesh Kansara, et al., *Swan-Ganz Entrapment During Cardiac Surgery–a Case Report*, 29 Indian J. Thoracic Cardiovascular Surgery (2013) (the Kansara article); and Eduards J. Vucins, M.D., et al., *Vent Stitch Entrapment of Swan Ganz Catheters During Cardiac Surgery*, 63 Anesth Analg 772 (1984) (the Vucins article).

to ensnare a Swan-Ganz catheter. Plaintiffs did not provide deposition testimony or affidavits from the colleagues.

At the end of the hearing, the trial court found Dr. Samuels' testimony reliable under MRE 702 and MCL 600.2955. The trial court concluded that, on the basis of the Kaplan, Kansara, and Vucins articles, and Dr. Samuels' testimony about his polling of his colleagues, factors (a) and (d) of MCL 600.2955(1) were not applicable, but factors (b), (c), (e), (f), and (g) were demonstrated. The trial court therefore denied defendants' motion to exclude Dr. Samuels' testimony. [*Walsh v Sakwa*, unpublished per curiam opinion of the Court of Appeals, issued September 1, 2022 (Docket No. 356517), p 2-4.]

This Court granted defendants leave to appeal the trial court's order. *Walsh v Sakwa*, unpublished order of the Court of Appeals, entered June 16, 2021 (Docket No. 356517). On appeal, defendants contended that the trial court abused its discretion by finding Dr. Samuels' standard of care testimony reliable and therefore admissible. This Court agreed, holding that the trial court clearly erred by finding that Dr. Samuels' testimony met the factors of MCL 600.2955(1)(b), (c), (e), (f), and (g). This Court reasoned that the literature and testimony regarding his informal polling of colleagues that was offered to support Dr. Samuels' opinion was not sufficient to demonstrate that his opinion was reliable and generally accepted in the relevant community, rendering his opinion unreliable. Determining that the trial court therefore abused its discretion by admitting the testimony, and that the admission of the unreliable testimony would be inconsistent with substantial justice, this Court reversed the trial court's order and remanded to the trial court for entry of an order granting defendants' motion to exclude Dr. Samuels' testimony. *Walsh*, unpub op at 9.

Plaintiffs sought leave to appeal to our Supreme Court, which held the application in abeyance pending that Court's decision in *Danhoff*. After issuing its decision in *Danhoff*, in lieu of granting leave to appeal, the Supreme Court vacated the judgment of this Court in this case and remanded the case to this Court for reconsideration in light of *Danhoff*.

## II. DISCUSSION

## A. STANDARD OF REVIEW

We review for an abuse of discretion a trial court's decision regarding the admissibility of witness testimony. *Danhoff*, 513 Mich at 441. A trial court abuses its discretion when it chooses an outcome outside the range of reasonable and principled outcomes, and also when it bases its use of discretion upon an error of law. *Id*. at 442. We review the trial court's factual findings underlying the decision to admit or exclude evidence for clear error. *Shivers v Covenant Healthcare System*, 339 Mich App 369, 373-374; 983 NW2d 427 (2021). We review de novo questions of law underlying evidentiary rulings. *Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016). But "any error in the admission or exclusion of evidence will not warrant appellate relief unless refusal to take this action appears . . . inconsistent with substantial justice, or affects a substantial right of the [opposing] party." *Craig v Oakwood Hosp*, 471 Mich 67, 76; 684 NW2d 296 (2004), citing MCR 2.613 (quotation marks omitted).

B. STANDARD OF CARE

When this case was before this Court previously, we discussed the relevant Michigan authority regarding the standard of care and its application in this case as follows:

A claim of medical malpractice arises during a professional medical relationship and hinges upon a question of medical judgment. *Lockwood v Mobile Med Response, Inc*, 293 Mich App 17, 23; 809 NW2d 403 (2011). To establish medical malpractice, the plaintiff must demonstrate (1) the applicable standard of care, (2) breach of that standard of care by the defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury. *Rock v Crocker*, 499 Mich 247, 255; 884 NW2d 227 (2016).

The standard of care refers to what a professional must or must not do. *Moning v Alfono*, 400 Mich 425, 437-438; 254 NW2d 759 (1977). A breach of the standard of care is a deviation from that standard. See *Martinez v Redform Comm Hosp*, 148 Mich App 221, 230; 384 NW2d 134 (1986). With respect to the standard of care for a specialist, "the plaintiff has the burden of proving that in light of the state of the art existing at the time of the alleged malpractice," the defendant "failed to provide the recognized standard of practice or care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances . . . ." MCL 600.2912a(1)(b). The standard of care required of a specialist, here a cardiac surgeon, is "what the ordinary [cardiac surgeon] of ordinary learning, judgment or skill would do or would not do under the same or similar circumstances." See *Albro v Drayer*, 303 Mich App 758, 764; 846 NW2d 70 (2014), citing M Civ JI 30.01.

Ordinarily, expert testimony is required to establish both the standard of care and that the defendant breached the standard. *Elher*, 499 Mich at 21. "Expert testimony is necessary to establish the standard of care because the ordinary layperson is not equipped by common knowledge and experience to judge the skill and competence of the service and determine whether it meets the standard of practice in the community." *Decker v Rochowiak*, 287 Mich App 666, 686; 791 NW2d 507 (2010) (quotation marks and citation omitted). The party offering the expert must demonstrate that the witness is knowledgeable regarding the applicable standard of care. *Id.* at 685. Expert testimony may not be based on mere speculation, and there "must be facts in evidence to support the opinion testimony of an expert." *Teal v Prasad*, 283 Mich App 384, 395; 772 NW2d 57 (2009).

The admission of expert testimony is governed by MRE 702 and MCL 600.2955. *Elher*, 499 Mich at 21-22. The trial court may admit expert testimony "only once it ensures, pursuant to MRE 702, that expert testimony meets that rule's standard of reliability." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 391 (2004). MRE 702 incorporates the standards for determining the reliability of expert testimony articulated in *Daubert v Merrill Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L: Ed 2d 469 (1993), and requires the trial court to determine that each aspect of a proposed expert witness' testimony is reliable,

-6-

including the underlying principles and methodology. *Elher*, 499 Mich at 22. MRE 702 provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In addition to MRE 702, the trial court in a medical malpractice case also must consider the factors listed in MCL 600.2955(1) when deciding whether an expert's opinion and its basis are reliable. *Elher*, 499 Mich at 22-23. The trial court is required to consider the facts, technique, method, and reasoning upon which the expert relied, as provided in MCL 600.2955(1) as follows:

> (1) In an action for the death of a person or for injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact. In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:
>
> (a) Whether the opinion and its basis have been subjected to scientific testing and replication.
>
> (b) Whether the opinion and its basis have been subjected to peer review publication.
>
> (c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.
>
> (d) The known or potential error rate of the opinion and its basis.
>
> (e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation. [MCL 600.2955(1)].

Depending on the context, some factors identified in MCL 600.2955(1) may not apply in a given case. *Elher*, 499 Mich at 26.

Here, to establish the standard of care, plaintiffs proffered the testimony of Dr. Samuels, who opined that the standard of care was to refrain from stitching the Swan-Ganz catheter during the procedure, and that stitching the catheter breached the standard of care. Relying on the three articles and Dr. Samuels' testimony about his conversations with his colleagues, the trial court concluded that MCL 600.2955 (b), (c), (e), (f), and (g) were met. With respect to factor (b), whether the expert's opinion and its basis were subjected to peer-reviewed publication, the trial court found that the three articles presented agreed with Dr. Samuels that the surgeon should not stitch the catheter to the heart. With respect to factor (c), whether the expert's opinion and its basis are consistent with the existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique, the trial court again found that the three articles presented were consistent with Dr. Samuels' testimony that the surgeon should not stitch the catheter to the heart. With respect to factor (e), the degree to which the expert's opinion and its basis are generally accepted within the relevant expert community, the trial court found that this factor was satisfied by Dr. Samuels' testimony that six of seven colleagues whom he consulted agreed with him regarding the standard of care. With respect to factor (f), whether the basis of the expert's testimony was reliable, and factor (g), whether the opinion or methodology is relied upon by experts outside of the context of litigation, the trial court found that both factors were satisfied by the articles and Dr. Samuels' survey of his colleagues.

Defendants challenge these findings. Defendants argue that the three articles do not support Dr. Samuels' opinion, and that his testimony about the opinions of his colleagues is not adequate to demonstrate that Dr. Samuels' opinion is generally accepted in the community of cardiac surgeons. Defendants contend that the trial court erred by finding that MCL 600.2955 (b), (c), (e), (f), and (g) were met. We agree.

As the gatekeeper for expert testimony, the trial court is required to conduct a "searching inquiry," not only of the data underlying the expert testimony, but also the manner in which the expert interprets the data. *Gilbert*, 470 Mich at 782. Although the support of peer-reviewed, published literature is not always necessary for the admission of expert testimony, a lack of supporting literature may render an expert's opinion unreliable; lack of supporting medical literature is an important consideration in determining the admissibility of expert witness testimony. *Edry v*

*Adelman*, 486 Mich 634, 640-641; 786 NW2d 567 (2010). Generally, it is not enough to argue that expert testimony is reliable, and therefore admissible, based solely on the expert's experience and background. *Id*. at 642.

In this case, Dr. Samuels testified that the standard of care during the procedure in question was to refrain from stitching the catheter to the heart, and that doing so is a breach of the standard of care. That is, Dr. Samuels testified that the standard of care simply was not to stitch the catheter, i.e., not to make an error. The Kaplan, Kansara, and Vucins articles do not support Dr. Samuels' opinion. Typically, the standard of care consists of the steps the reasonably prudent professional would take to avoid error. It is insufficient to establish the standard of care simply to describe a bad outcome; rather, the standard of care should explain what a reasonably prudent doctor would do, in keeping with the standards of professional practice, in order to avoid that bad outcome. See *Locke v Pachtman*, 446 Mich 216, 225; 521 NW2d 786 (1994). Otherwise, "the jury would have had no standard against which to measure [the defendant's] conduct." *Id*.

In this case Dr. Samuels stated that it was incorrect procedure for a surgeon to stitch the catheter to the heart; however, neither Dr. Samuels nor the articles on which he relied stated what a prudent surgeon should do, in keeping with the standards of professional practice, that was not done by Dr. Sakwa. Although the articles agree that a surgeon should not stitch the catheter to the heart during a mitral-valve-repair surgery, the three articles relied upon by Dr. Samuels do not state that a surgeon who accidentally ensnares the Swan-Ganz catheter during surgery has necessarily breached the standard of care. Rather, the articles explain how entrapment may occur and advise what a surgeon should do afterward to free the catheter; the articles do not state the steps the surgeon must take to ensure that he or she does not stitch the catheter during the surgery.

For example, the Kaplan article observes that a Swan-Ganz catheter may be trapped in a suture line during heart surgery. After reviewing 10 cases of Swan-Ganz entrapments during open heart surgery, the authors concluded: "When performing open heart surgery, the surgeon should not leave the Swan-Ganz catheter in the suture while closing the right or left atriotomy, or during venous cannulation. In addition, the catheter should be moved after suture to ensure that there is no entrapment." The authors do not, however, direct the steps a surgeon should take to avoid initially stitching the Swan-Ganz catheter.

Similarly, the Kansara article examines a case in which a Swan-Ganz catheter had been "entrapped in left ariotonty suture line via a deep suture that had gone through the superior vena cava." The authors recommend that upon completing surgery the surgeon check to make sure the Swan-Ganz catheter was not ensnared, by "pulling the catheter 5-10 cm at the termination of [surgery], and then reposition[ing the catheter] to ensure its free mobility and early recognition of catheter entrapment." Like the Kaplan article, the Kansara article fails to describe what the prudent surgeon should do to avoid ensnaring the Swan-Ganz catheter in the first place.

The Vucins article states that "the placement of sutures, especially atrial sutures, may unintentionally entrap the PA catheter . . . . The close proximity of the right and left atria at the level of the right superior pulmonary vein allows a stitch to pass through the back wall of the right atrium." The authors reported that to reduce the possibility of catheter entrapment, they now insert the catheter using a self-sealing sleeve; the authors then recommend that upon completing the surgery, the surgeon move the catheter to ensure that it moves freely. As with the other two articles on which plaintiffs' expert relied, the Vucins article does not describe the technique a surgeon should employ to avoid ensnaring the catheter. Instead, like the other two articles, the Vucins article states that this is an outcome that can occur, albeit rarely, and describes what to do in the event this outcome is reached. None of the articles state that a surgeon who has initially ensnared a Swan-Ganz has deviated from professional norms, but only advise that the catheter should be checked at the end of the procedure to ensure that it is moving freely, and if it is not the catheter should be freed from the stiches.

In addition, Dr. Samuels' testimony about an informal survey of seven colleagues sheds little light on whether and to what degree Dr. Samuels' opinion is generally accepted in the community of cardiac surgeons. At most, Dr. Samuels' informal survey reveals that six of seven colleagues who are cardiac surgeons agree with his opinion and its basis. This unverified assertion, without more, is not sufficient to establish that Dr. Samuels' opinion regarding the standard of care is generally accepted. Dr. Samuels' colleagues appear to have employed the same circular reasoning Dr. Samuels used in assessing Dr. Sakwa's performance of this surgical procedure. That is, the physicians concluded that suturing the Swan-Ganz catheter is malpractice because a surgeon operating within the standard of care should not suture the Swan-Ganz catheter. But none of the physicians, including Dr. Samuels, appear to have opined on what Dr. Sakwa should have done differently to avoid this outcome. Plaintiffs' expert's theory, which appears to hold that malpractice has occurred because of a bad outcome, is akin to strict liability, which the law does not recognize in the context of professional malpractice. [*Walsh v Sakwa*, unpublished per curiam opinion of the Court of Appeals, issued September 1, 2022 (Docket No. 356317), p 5-9.]

This Court concluded that the trial court clearly erred by finding that Dr. Samuels' testimony met the factors of MCL 600.2955 (b), (c), (e), (f), and (g), because neither Dr. Samuels' testimony, nor the literature offered to support Dr. Samuels' opinion, nor his testimony about the informal polling of his colleagues were sufficient to establish the standard of care, and thereby demonstrate that his opinion was reliable and generally accepted in the relevant community. This Court held that the trial court therefore abused its discretion by determining that Dr. Samuels' testimony was admissible, and that the admission of the unreliable testimony would be inconsistent with substantial justice. This Court therefore reversed the order of the trial court and remanded to the trial court for entry of an order granting defendants' motion in limine.

## C. *DANHOFF*

Our Supreme Court held plaintiffs' application for leave to appeal to that Court in abeyance pending that Court's decision in *Danhoff*. In *Danhoff*, the defendant, Dr. Daniel Fahim, M.D., performed lumbar spinal surgery on the plaintiff, Lynda Danhoff, in a procedure known as an extreme lateral intrabody fusion (XLIF). *Danhoff*, 513 Mich at 434. After the surgery, it was determined that Danhoff's sigmoid colon had been perforated during the XLIF procedure, necessitating additional surgeries and a lengthy hospital stay, and allegedly resulting in permanent medical conditions. *Id.* at 435. Danhoff and her husband filed a medical malpractice action; their complaint was supported by an affidavit of merit executed by their expert, Dr. Christopher Koebbe, M.D., who essentially averred that the standard of care was to perform the XLIF procedure in a manner that avoided perforating a patient's colon, and offering suggestions of what could have been done differently by the medical professionals to comport with the standard of care. *Id.* at 435-437.

Dr. Koebbe testified that there were a few articles stating that the complication of a perforated colon was extremely rare while performing the spinal surgery, occurring less than one percent of the time, and that the particular injury was "an extremely rare complication that was more likely than not caused by a surgical instrument perforating the colon, an area far enough away from the operative region so as to constitute a breach of the standard of care." *Id.* at 438. The trial court granted the defendants' motion for summary disposition under MCR 2.116(C)(10), finding that the plaintiffs "did not present any foundation as to the reliability and admissibility of Dr. Koebbe's standard of care testimony as required by MRE 702 and MCL 600.2955." *Id.* at 462 (ZAHRA, J., dissenting).

The plaintiffs moved for reconsideration, submitting a new affidavit from Dr. Koebbe, and attaching medical articles that purportedly supported his opinion that a bowel injury caused during the type of procedure performed was not an acceptable known complication but instead was a rare occurrence that necessarily was the result of surgical error. *Danhoff*, 513 Mich at 439. The trial court denied the motion for reconsideration, concluding that Dr. Koebbe's affidavit and attached articles did not demonstrate that Dr. Koebbe's testimony was reliable. *Id.* This Court affirmed the trial court's ruling. *Id.*

Our Supreme Court in *Danhoff* reversed the decision of this Court and remanded the matter to the trial court to redetermine whether Dr. Koebbe's opinions were reliable under MRE 702, MCL 600.2955, and MCL 600.2169. The Supreme Court held that the trial court and this Court erred by concluding that Dr. Koebbe's opinions were unreliable on the basis that they were unsupported by medical literature. *Id.* at 456. The Supreme Court explained that MRE 702, MCL 600.2955, and MCL 600.2169 govern "whether an expert is qualified," and confirmed that *Elher* and *Edry v Adelman*, 486 Mich 634; 786 NW2d 567 (2010), continue to provide the legal standards to assess expert reliability. *Danhoff*, 513 Mich at 452.

In *Edry*, the Supreme Court held that "while not dispositive, a lack of supporting literature is an important factor in determining the admissibility of expert witness testimony." *Edry*, 486 Mich at 640, citing *Craig*, 471 Mich at 83-84. The Court in *Edry* further concluded that "[w]hile peer-reviewed, published literature is not always a necessary or sufficient method of meeting the requirements of MRE 702, in this case the lack of supporting literature, combined with the lack of

-11-

any other form of support for [the expert's] opinion, renders [the] opinion unreliable and inadmissible under MRE 702." *Edry*, 486 Mich at 641.

Similarly, the Supreme Court in *Elher*, consistent with *Edry*, stated that "[a] lack of supporting literature, while not dispositive, is an important factor in determining the admissibility of expert witness testimony." *Elher*, 499 Mich at 23. The Court in *Elher* further concluded that the trial court did not abuse its discretion by concluding that the expert's testimony in that case was unreliable because the expert "admitted that his opinion was based on his own beliefs, [and] there was no peer-reviewed medical literature supporting his opinion." *Id*. at 27-28.

In *Danhoff*, the Supreme Court held that in the context of a medical malpractice case, the use of scientific literature is not always necessary or sufficient to establish the requirements stated in MRE 702, especially when the adverse medical event is rare and no supportive literature is available. *Danhoff*, 513 Mich at 432-433. The Supreme Court explained that the absence of published medical literature does not necessarily render the proposed expert's testimony unreliable and therefore inadmissible, but nor does published medical literature ensure reliability. *Danhoff*, 513 Mich at 453. Rather, "[e]xpert testimony is inadmissible when it does not meet the reliability requirements of MRE 702, MCL 600.2955, and MCL 600.2169," *Danhoff*, 513 Mich at 454, and instead "scientific literature is one of the factors that a trial court should consider when determining whether the opinion is reliable." *Id*. at 433. The Court explained:

> Neither MRE 702 nor MCL 600.2955 requires a trial court to exclude the testimony of a plaintiff's expert on the basis of the plaintiff's failure to support their expert's claims with published literature. Instead MCL 600.2955 presents a nonexhaustive list of seven factors that a trial court shall consider when it determines whether an expert's opinions are reliable.
>
> * * *
>
> Although published literature may be an important factor in determining reliability, it is not a dispositive factor, the absence of which results in a finding that the proposed expert's testimony is unreliable and thus, inadmissible. [*Danhoff*, 513 Mich at 452-453.]

The Supreme Court did not determine the admissibility of Dr. Koebbe's testimony in *Danhoff*, but held that the lower courts erred by finding Dr. Koebbe's opinion unreliable merely because it was unsupported by medical literature and remanded to the trial court for reconsideration. *Id.* at 456.

Reconsidering this case in light of *Danhoff*, we once again conclude that the trial court in this case abused its discretion by admitting Dr. Samuels' testimony. This Court's previous opinion concluded that the evidence in this case was insufficient to demonstrate that Dr. Samuels' opinion was reliable. This Court's previous analysis comports with the standard announced in *Danhoff*, which reaffirmed the Supreme Court's prior rulings in *Elher* and *Edry*, and confirmed as proper the application of MRE 702 and MCL 600.2955 upon which this Court's opinion in this case rests. See *Walsh*, unpub op at 8-14. To the extent that *Danhoff* clarifies that *Elher* and *Edry* do not preclude the admissibility of an expert's opinion as reliable when the adverse medical event is rare and no supporting medical literature exists, the analysis in this case does not change.

As in *Danhoff*, the task before this Court was to "determine whether the testimony of a medical expert who presented an affidavit of merit to describe the standard of care and its potential breach was sufficiently reliable to be admissible." *Danhoff*, 513 Mich at 447. But unlike *Danhoff*, in this case the adverse medical event was not entirely rare and medical literature discussing the circumstances of the event was not absent.[3] Moreover, unlike *Danhoff*, this Court in this case did not find the expert opinion testimony unreliable because it was unsupported by medical literature; rather, this Court held that Dr. Samuels' testimony and the literature proffered to support his opinion did not properly articulate a standard of care.

As discussed, Dr. Samuels testified that the standard of care during the procedure in question was to refrain from stitching the catheter to the heart, and to verify before closing the incision that the catheter is not ensnared. Dr. Samuels opined that Dr. Sakwa must have violated the standard of care because the catheter became ensnared. That is, Dr. Samuels testified that the standard of care simply was not to stitch the catheter, i.e., not to make an error. Plaintiffs submitted literature advising that the catheter is not to be ensnared by sutures, which states the obvious.

But typically, the standard of care consists of the steps a reasonably prudent professional would take to avoid an adverse medical event. It is insufficient to establish the standard of care simply to describe a bad outcome and decry it; rather, the standard of care should explain what a reasonably prudent doctor would do, in keeping with the standards of professional practice, to avoid that bad outcome. See *Locke v Pachtman*, 446 Mich 216, 225; 521 NW2d 786 (1994). Otherwise, "the jury would have had no standard against which to measure [the defendant's] conduct." *Id.* Again, unlike *Danhoff*, in this case this Court did not focus on the lack of published literature supporting Dr. Samuels' opinion, but instead concluded that Dr. Samuels and the literature upon which he based his opinion did not adequately identify the standard of care, or rather, any standard of care at all.

On remand, plaintiffs correctly state that *Danhoff* did not overrule either *Elher* or *Edry*. See *Danhoff*, 513 Mich at 452. Plaintiffs assert, however, that before the Supreme Court's decision in *Danhoff*, *Ehler* left doubt regarding the role of medical literature in determining the reliability of a standard-of-care witness in a medical malpractice action, resulting in Michigan courts thereafter over-emphasizing the importance of medical literature in assessing an expert witness. The Court in *Danhoff*, however, did not discard published literature from the considerations relevant to determining the reliability of an expert's testimony. On the contrary, while *Danhoff* explained that the lack of published literature does not necessarily render an expert's testimony inadmissible, *Danhoff* stressed that a trial court is required to test proffered expert testimony under MRE 702, MCL 600.2955, and MCL 600.2169, emphasizing that MCL 600.2955 "presents a nonexhaustive list of seven factors that a trial court shall consider when it determines whether an expert's opinions are reliable." *Danhoff*, 513 Mich at 453. Of the seven statutory factors, factor (b) specifically requires a trial court to consider whether the opinion and its basis have been subjected to "peer review publication," while factors (a), (e), (f), and (g) require a trial court to consider whether the opinion and its basis have been subjected to scientific testing and replication

---

[3] For example, the Kaplan article discussed having reviewed 10 cases of Swan-Ganz catheter entrapments. See *Walsh*, unpub op at 8.

and the acceptance of the proffered opinion in the relevant expert community and outside of the context of litigation, all of which suggest the consideration of some sort of published material. See MCL 600.2955(a), (b), (e), (f), and (g).

In this case, the proffered published material, which we are still to consider under *Danhoff*, suffers from the same defect inherent in Dr. Samuels' testimony. It too fails to establish a reliable standard of care. Both Dr. Samuels and the literature merely counsel against a certain bad result, but without instructing how to avoid the bad result. The failure of Dr. Samuels' testimony in this case is that it does not articulate a standard of care. Our holding is premised on this deficiency in Dr. Samuels' testimony, not strictly on the lack of scientific literature in support of it, which was the issue addressed in *Danhoff*.

Upon reconsidering this case in light of *Danhoff*, we conclude that *Danhoff* does not alter or negate the conclusion of this Court's prior opinion that the trial court clearly erred by finding that Dr. Samuels' opinion testimony satisfied the factors in MCL 600.2955(1), and thus the trial court abused its discretion by admitting the testimony. Reversed and remanded to the trial court for entry of an order granting defendants' motion to exclude Dr. Samuels' testimony. We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Michael J. Kelly